# EASTLAND ET AL. *v.* UNITED STATES SERVICE-MEN'S FUND ET AL.

No. 73–1923.  Argued January 22, 1975—Decided May 27, 1975

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in the judgment, in which BRENNAN and STEWART, JJ., joined, *post*, p. 513. DOUGLAS, J., filed a dissenting opinion, *post*, p. 518.

*Herbert J. Miller, Jr.,* argued the cause for petitioners. With him on the brief were *Nathan Lewin* and *A. Raymond Randolph, Jr.*

*Nancy Stearns* and *Jeremiah S. Gutman* argued the cause and filed a brief for respondents.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether a federal court may enjoin the issuance by Congress of a subpoena *duces tecum* that directs a bank to produce the bank records of an organization which claims a First Amend-

ment privilege status for those records on the ground that they are the equivalent of confidential membership lists. The Court of Appeals for the District of Columbia Circuit held that compliance with the subpoena "would invade the constitutional rights" of the organization, and that judicial relief is available to prevent implementation of the subpoena.

## I

In early 1970 the Senate Subcommittee on Internal Security was given broad authority by the Senate to "make a complete and continuing study and investigation of . . . the administration, operation, and enforcement of the Internal Security Act of 1950 . . . ." S. Res. 341, 91st Cong., 2d Sess. (1970). The authority encompassed discovering the "extent, nature, and effect of subversive activities in the United States," and the resolution specifically directed inquiry concerning "infiltration by persons who are or may be under the domination of the foreign government . . . ." *Ibid.* See also S. Res. 366, 81st Cong., 2d Sess. (1950). Pursuant to that mandate the Subcommittee began an inquiry into the activities of respondent United States Servicemen's Fund, Inc. (USSF).

USSF describes itself as a nonprofit membership corporation supported by contributions.[1] Its stated purpose is "to further the welfare of persons who have served or are presently serving in the military." To accomplish its declared purpose USSF has engaged in various activities[2] directed at United States servicemen.

---

[1] USSF is, or has been, listed with the Internal Revenue Service as a tax-exempt charitable organization.

[2] According to the complaint filed in this action USSF has helped provide civilian legal defense for military personnel, and books, newspapers, and library material on request. App. 11.

494

It established "coffeehouses" near domestic military installations, and aided the publication of "underground" newspapers for distribution on American military installations throughout the world. The coffeehouses were meeting places for servicemen, and the newspapers were specialized publications which USSF claims dealt with issues of concern to servicemen. Through these operations USSF attempted to communicate to servicemen its philosophy and attitudes concerning United States involvement in Southeast Asia. USSF claims the coffeehouses and newspapers became "the focus of dissent and expressions of opposition within the military toward the war in [Southeast Asia]." [3]

In the course of its investigation of USSF, the Subcommittee concluded that a prima facie showing had been made of the need for further investigation, and it resolved that appropriate subpoenas, including subpoenas *duces tecum* could be issued. Petitioner Eastland, a United States Senator, is, as he was then, Chairman of the Subcommittee. On May 28, 1970, pursuant to the above authority, he signed a subpoena *duces tecum,* issued on behalf of the Subcommittee, to the bank where USSF then had an account. The subpoena commanded the bank to produce by June 4, 1970:

> "any and all records appertaining to or involving the account or accounts of [USSF]. Such records to comprehend papers, correspondence, statements, checks, deposit slips and supporting documentation, or microfilm thereof within [the bank's] control or custody or within [its] means to produce."

From the record it appears the subpoena was never actually served on the bank.[4] In any event, before the

---

[3] *Ibid.*

[4] The subpoena at issue here directed "Any U. S. Marshal" to serve and return, but there is no proof of service in the record. The

return date, USSF and two of its members brought this action to enjoin implementation of the subpoena *duces tecum*.

The complaint named as defendants Chairman East-land, nine other Senators, the Chief Counsel to the Subcommittee, and the bank.[5] The complaint charged that the authorizing resolutions and the Subcommittee's actions implementing them were an unconstitutional abuse of the legislative power of inquiry, that the "sole purpose" of the Subcommittee investigation was to force "public disclosure of beliefs, opinions, expressions and associations of private citizens which may be unorthodox or unpopular," and that the "sole purpose" of the sub-poena was to "harass, chill, punish and deter [USSF and its members] in their exercise of their rights and duties under the First Amendment and particularly to stifle the freedom of the press and association guaran-teed by that amendment."[6] The subpoena was issued to the bank rather than to USSF and its members, the complaint claimed, "in order to deprive [them] of their rights to protect their private records, such as the sources of their contributions, as they would be entitled to do if the subpoenas had been issued against them directly." The complaint further claimed that financial support to

---

Subcommittee had issued two previous subpoenas *duces tecum* to the bank, but they had been withdrawn because of procedural prob-lems. Apparently, at least one of those subpoenas actually was served on the bank. *Id.*, at 13. The other subpoena also may have been served because the bank informed respondents of its exist-ence. *Id.*, at 14. Respondents claim all three subpoenas are sub-stantially identical.

[5] Apparently, at least partially because the bank was never served, Tr. of Oral Arg. 22, 46, it has not participated in the action. *Id.*, at 15, 19–20, 21–22. Therefore, as the case reaches us only the Senators and the Chief Counsel are active participants.

[6] App. 16.

USSF is obtained exclusively through contributions from private individuals, and if the bank records are disclosed "much of that financial support will be withdrawn and USSF will be unable to continue its constitutionally protected activities." [7]

For relief USSF and its members, the respondents, sought a permanent injunction restraining the Members of the Subcommittee and its Chief Counsel from trying to enforce the subpoena by contempt of Congress or other means and restraining the bank from complying with the subpoena.[8] Respondents also sought a declaratory judgment declaring the subpoena and the Senate resolutions void under the Constitution. No damages claim was made.

Since the return date on the subpoena was June 4, 1970, three days after the action was begun, enforcement of the subpoena was stayed [9] in order to avoid mootness and to prevent possible irreparable injury. The District Court then held hearings and took testimony on the matter. That court ultimately held [10] that respondents

---

[7] *Id.,* at 17–18.

[8] *Id.,* at 18.

[9] On June 1, the District Court refused to enter a temporary restraining order, but on June 4 the Court of Appeals stayed enforcement of the subpoena pending expedited consideration of the matter by the District Court. The Court of Appeals reasoned that the threat of irreparable injury if the subpoena were honored, and the significance of the issues involved, necessitated "the kind of consideration and deliberation that would be provided by . . . a hearing on an application for injunction." *Id.,* at 22. One judge dissented.

[10] After the Court of Appeals stayed enforcement of the subpoena the District Court held an expedited hearing on respondents' motion for a preliminary injunction and petitioners' motion to dismiss. Afterwards the District Court denied both motions; however, the Court of Appeals again stayed enforcement of the subpoena pending further order. At that time the Court of Appeals ordered the District Court to proceed to final judgment on the merits, with a

had not made a sufficient showing of irreparable injury to warrant an injunction. The court also purported to strike a balance between the legislative interest and respondents' asserted First Amendment rights, *NAACP* v. *Alabama*, 357 U. S. 449 (1958). It concluded that a valid legislative purpose existed for the inquiry because Congress was pursuing its functions, under Art. I, § 8, of raising and supporting an army, and had a legitimate interest in "scrutiniz[ing] closely possible infiltration of subversive elements into an organization which directly affects the armed forces of this country." [11] Relying on *Barenblatt* v. *United States*, 360 U. S. 109 (1959), the District Court concluded that the legislative interest must prevail over respondents' asserted rights, and denied respondents' motions for preliminary and permanent injunctions. It also dismissed as to the petitioner Senators after concluding that the Speech or Debate Clause immunizes them from suit. *Dombrowski* v. *Eastland*, 387 U. S. 82 (1967).

The Court of Appeals reversed, holding first that, although courts should hesitate to interfere with congressional actions even where First Amendment rights clearly are implicated, such restraint could not preclude judicial review where no alternative avenue of relief is available other than "through the equitable powers of the court." 159 U. S. App. D. C. 352, 359, 488 F. 2d 1252, 1259 (1973). Here the subpoena was directed to a third party which could not be expected to refuse

---

view to consolidating any appeal from that judgment with the appeal on the denial of a preliminary injunction. The District Court then took testimony on the merits and, finally, denied respondents' motion for a permanent injunction against the subpoena. Appeal from that decision apparently was consolidated with the appeal from the denial of the preliminary injunction..

[11] *Id.*, at 31.

compliance; unless respondents could obtain judicial relief the bank might comply, the case would become moot, and the asserted violation of respondents' constitutional rights would be irreparable. Because the subpoena was not directed to respondents, the Court of Appeals noted, the traditional route for raising their defenses by refusing compliance and testing the legal issues in a contempt proceeding was not available to them. *Ansara* v. *Eastland,* 143 U. S. App. D. C. 29, 442 F. 2d 751 (1971).

Second, the Court of Appeals concluded that if the subpoena were obeyed respondents' First Amendment rights would be violated. The court said:

> "The right of voluntary associations, especially those engaged in activities which may not meet with popular favor, to be free from having either state or federal officials expose their affiliation and membership absent a compelling state or federal purpose has been made clear a number of times. See NAACP v. Alabama, 357 U. S. 449; Bates v. Little Rock, 361 U. S. 516; Louisiana ex rel. Gremillion v. NAACP, 366 U. S. 293 (1961); Gibson v. Florida Legislative Committee, 372 U. S. 539 (1962); Pollard v. Roberts, 393 U. S. 14 (1968), affirming the judgment of the three-judge district court for the Eastern District of Arkansas, 283 F. Supp. 248 (1968)." 159 U. S. App. D. C., at 364, 488 F. 2d, at 1264.

In this case that right would be violated, the Court of Appeals held, because discovery of the identities of donors was the admitted goal of the subpoena, *id.,* at 367, 488 F. 2d, at 1267, and that information could be gained as easily from bank records as from membership lists. Moreover, if donors' identities were revealed, or if donors reasonably feared that result, USSF's contributions would

decrease substantially, as had already occurred merely because of the threat posed by the subpoena.[12]

The Court of Appeals then fashioned a remedy to deal with the supposed violation of rights. It ordered the District Court to "consider the extent to which committee counsel should properly be required to give evidence as to matters without the 'legislative sphere.' " *Id.,* at 370, 488 F. 2d, at 1270.[13] It also ordered that the court should "be liberal in granting the right of amendment" to respondents to add other parties if thereby "the case can better proceed to a decision on the validity of the subpoena." *Ibid.* Members of Congress could be added as parties, the Court of Appeals said, if their presence is "unavoidable if a valid order is to be entered by the court to vindicate rights which would otherwise go unredressed." *Ibid.* The Court of Appeals concluded that

---

[12] It appears that the District Court finding of failure to show irreparable injury was held clearly erroneous. 159 U. S. App. D. C. 352, 367, 488 F. 2d 1252, 1267 (1973). See Fed. Rule Civ. Proc. 52 (a).

[13] Respondents had made a motion in the District Court to compel petitioner Sourwine, the subcommittee counsel, to give testimony. The Senate passed a resolution; S. Res. 478, 91st Cong., 2d Sess., Oct. 13, 1970, authorizing Sourwine to testify only as to matters of public record. Respondents moved to compel further testimony from Sourwine, but the District Court denied the motion. The court ruled Sourwine's information "has been received by him pursuant to his official duties as a staff employee of the Senate . . . [and as] such, the information is within the privilege of the Senate . . . *Senate Rule 301, Senate Manual, Senate Document No. 1 of the 90th Congress, First Session."* App. 38. The court also ruled that the Senate made a timely and appropriate invocation of its privilege. Thus information held by Sourwine was not discoverable. Fed. Rule Civ. Proc. 26 (b)(1). Respondents' appeal from this ruling was heard by the Court of Appeals with their appeals from the denial of injunctive relief. 159 U. S. App. D. C., at 358, 488 F. 2d, at 1258.

declaratory relief against Members is "preferable" to "any coercive order." *Ibid.* The clear implication is that the District Court was authorized to enter a "coercive order" which in context could mean that the Subcommittee could be prevented from pursuing its inquiry by use of a subpoena to the bank.

One judge dissented on the ground that the membership-list cases were distinguishable because in none of them was there a "showing that the lists were requested for a proper purpose." *Id.,* at 377, 488 F. 2d, at 1277. Here, on the other hand, the dissenting judge concluded, "there is a demonstrable relationship between the information sought and the valid legislative interest of the federal Congress" in discovering whether any money for USSF activities "came from foreign sources or subversive organizations," *id.,* at 377, 378, 488 F. 2d, at 1277, 1278; whether USSF activities may have constituted violations of 18 U. S. C. § 2387 (a), which prohibits interference with the loyalty, discipline, or morale of the Armed Services; or whether the anonymity of USSF donors might have disguised persons who had not complied with the Foreign Agents Registration Act of 1938, 22 U. S. C. § 611 *et seq.* Finally, he noted that the prime purpose of the Subcommittee's inquiry was to investigate application of the Internal Security Act of 1950, 50 U. S. C. § 781 *et seq.,* and that, too, provided a legitimate congressional interest.

The dissenting judge then balanced the congressional interests against private rights, *Barenblatt* v. *United States, supra; Watkins* v. *United States,* 354 U. S. 178, 198 (1957), and struck the balance in favor of the investigative role of Congress. He reasoned that there is no right to secrecy which can frustrate a legitimate congressional inquiry into an area where legislation may be had. 159 U. S. App. D. C., at 378–379, 382, 488 F. 2d, at 1278–

1279, 1282. Absent a showing that the information sought could not be used in the legislative sphere, he concluded, judicial interference was unwarranted.

We conclude that the actions of the Senate Subcommittee, the individual Senators, and the Chief Counsel are protected by the Speech or Debate Clause of the Constitution, Art. I, § 6, cl. 1, and are therefore immune from judicial interference. We reverse.

## II

The question [14] to be resolved is whether the actions of the petitioners fall within the "sphere of legitimate legislative activity." If they do, the petitioners "shall not be questioned in any other Place" about those activities since the prohibitions of the Speech or Debate Clause are absolute, *Doe* v. *McMillan,* 412 U. S. 306, 312–313 (1973); *United States* v. *Brewster,* 408 U. S. 501, 516 (1972); *Gravel* v. *United States,* 408 U. S. 606, 623 n. 14 (1972); *Powell* v. *McCormack,* 395 U. S. 486, 502–503 (1969); *Dombrowski* v. *Eastland,* 387 U. S., at 84–85; *United States* v. *Johnson,* 383 U. S. 169, 184–185 (1966); *Barr* v. *Matteo,* 360 U. S. 564, 569 (1959).

Without exception, our cases have read the Speech or Debate Clause broadly to effectuate its purposes. *Kil-*

---

[14] On this record the Court of Appeals correctly held that the District Court properly entertained this action initially. 159 U. S. App. D. C., at 359–360, 488 F. 2d, at 1259–1260. The Court of Appeals saw a significant difference between a subpoena that seeks information directly from a party and one that seeks the same information from a third person. In the former case the party can resist and thereby test the subpoena; in the latter case, however, unless a court may inquire to determine whether a legitimate legislative purpose is present, *Doe* v. *McMillan,* 412 U. S. 306, 312–313 (1973); *Gravel* v. *United States,* 408 U. S. 606, 624 (1972); *Tenney* v. *Brandhove,* 341 U. S. 367, 376 (1951), compliance by the third person could frustrate any judicial inquiry.

*bourn* v. *Thompson,* 103 U. S. 168, 204 (1881); *United States* v. *Johnson, supra,* at 179; *Powell* v. *McCormack, supra,* at 502–503; *United States* v. *Brewster, supra,* at 508–509; *Gravel* v. *United States, supra,* at 617–618; cf. *Tenney* v. *Brandhove,* 341 U. S. 367, 376–378 (1951). The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently.

> "The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States* v. *Brewster, supra,* at 507.

In our system "the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *United States* v. *Johnson, supra,* at 178.

The Clause is a product of the English experience. *Kilbourn* v. *Thompson, supra; United States* v. *Johnson, supra,* at 177–179. Due to that heritage our cases make it clear that the "central role" of the Clause is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary, *United States* v. *Johnson,* 383 U. S. 169, 181 (1966)," *Gravel* v. *United States, supra,* at 617. That role is not the sole function of the Clause, however, and English history does not totally define the reach of the Clause. Rather, it "must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government . . . ." *United States* v. *Brewster, supra,* at 508. Thus we have long held that, when it applies, the Clause provides protection against civil as well as criminal actions, and against actions brought by private indi-

viduals as well as those initiated by the Executive Branch. *Kilbourn* v. *Thompson, supra; Tenney* v. *Brandhove, supra; Doe* v. *McMillan, supra; Dombrowski* v. *Eastland, supra.*

The applicability of the Clause to private civil actions is supported by the absoluteness of the term "shall not be questioned," and the sweep of the term "in any other Place." In reading the Clause broadly we have said that legislators acting within the sphere of legitimate legislative activity "should be protected not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski* v. *Eastland, supra,* at 85. Just as a criminal prosecution infringes upon the independence which the Clause is designed to preserve, a private civil action, whether for an injunction or damages, creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation. Private civil actions also may be used to delay and disrupt the legislative function. Moreover, whether a criminal action is instituted by the Executive Branch, or a civil action is brought by private parties, judicial power is still brought to bear on Members of Congress and legislative independence is imperiled. We reaffirm that once it is determined that Members are acting within the "legitimate legislative sphere" the Speech or Debate Clause is an absolute bar to interference. *Doe* v. *McMillan,* 412 U. S., at 314.

### III

In determining whether particular activities other than literal speech or debate fall within the "legitimate legislative sphere" we look to see whether the activities took place "in a session of the House by one of its members in relation to the business before it." *Kilbourn* v.

*Thompson,* 103 U. S., at 204. More specifically, we must determine whether the activities are

> "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel* v. *United States,* 408 U. S., at 625.

See *Doe* v. *McMillan, supra,* at 313.

The power to investigate and to do so through compulsory process plainly falls within that definition. This Court has often noted that the power to investigate is inherent in the power to make laws because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *McGrain* v. *Daugherty,* 273 U. S. 135, 175 (1927). See *Anderson* v. *Dunn,* 6 Wheat. 204 (1821); *United States* v. *Rumely,* 345 U. S. 41, 46 (1953).[15] Issuance of subpoenas such as the one in question here has long been held to be a legitimate use by Congress of its power to investigate. *Watkins* v. *United States,* 354 U. S., at 188.

> "[W]here the legislative body does not itself possess

---

[15] Although the power to investigate is necessarily broad it is not unlimited. Its boundaries are defined by its source. *Watkins* v. *United States,* 354 U. S. 178, 197 (1957). Thus, "[t]he scope of the power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt* v. *United States,* 360 U. S. 109, 111 (1959); *Sinclair* v. *United States,* 279 U. S. 263, 291–292 (1929). We have made it clear, however, that Congress is not invested with a " 'general' power to inquire into private affairs." *McGrain* v. *Daugherty,* 273 U. S. 135, 173 (1927). The subject of any inquiry always must be one "on which legislation could be had." *Id.,* at 177.

the requisite information—which not infrequently is true—recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed." *McGrain* v. *Daugherty, supra,* at 175.

It also has been held that the subpoena power may be exercised by a committee acting, as here, on behalf of one of the Houses. *Id.,* at 158. Cf. *Tenney* v. *Brandhove,* 341 U. S., at 377–378. Without such power the Subcommittee may not be able to do the task assigned to it by Congress. To conclude that the power of inquiry is other than an integral part of the legislative process would be a miserly reading of the Speech or Debate Clause in derogation of the "integrity of the legislative process." *United States* v. *Brewster,* 408 U. S., at 524; and *United States* v. *Johnson,* 383 U. S., at 172.

We have already held that the act "of authorizing an investigation pursuant to which . . . materials were gathered" is an integral part of the legislative process. *Doe* v. *McMillan,* 412 U. S., at 313. The issuance of a subpoena pursuant to an authorized investigation is similarly an indispensable ingredient of lawmaking; without it our recognition that the act "of authorizing" is protected would be meaningless. To hold that Members of Congress are protected for authorizing an investigation, but not for issuing a subpoena in exercise of that authorization, would be a contradiction denigrating the power granted to Congress in Art. I and would indirectly impair the deliberations of Congress. *Gravel, supra,* at 625.

The particular investigation at issue here is related to and in furtherance of a legitimate task of Congress.

*Watkins* v. *United States,* 354 U. S., at 187. On this record the pleadings show that the actions of the Members and the Chief Counsel fall within the "sphere of legitimate legislative activity." The Subcommittee was acting under an unambiguous resolution from the Senate authorizing it to make a complete study of the "administration, operation, and enforcement of the Internal Security Act of 1950 . . . ." S. Res. 341, 91st Cong., 2d Sess. (1970). That grant of authority is sufficient to show that the investigation upon which the Subcommittee had embarked concerned a subject on which "legislation could be had." *McGrain* v. *Daugherty,* 273 U. S., at 177; see *Communist Party* v. *Control Board,* 367 U. S. 1 (1961).

The propriety of making USSF a subject of the investigation and subpoena is a subject on which the scope of our inquiry is narrow. *Hutcheson* v. *United States,* 369 U. S. 599, 618–619 (1962). See *Sinclair* v. *United States,* 279 U. S. 263, 294–295 (1929). "The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Tenney* v. *Brandhove, supra,* at 378. Cf. *Doe* v. *McMillan,* 412 U. S., at 316 n. 10. Even the most cursory look at the facts presented by the pleadings reveals the legitimacy of the USSF subpoena. Inquiry into the sources of funds used to carry on activities suspected by a subcommittee of Congress to have a potential for undermining the morale of the Armed Forces is within the legitimate legislative sphere. Indeed, the complaint here tells us that USSF operated on or near military and naval bases, and that its facilities became the "focus of dissent" to declared national policy. Whether USSF activities violated any statute is not relevant; the inquiry was intended to inform Congress in an area where legislation may be had. USSF asserted it

does not know the sources of its funds; in light of the Senate authorization to the Subcommittee to investigate "infiltration by persons who are or may be under the domination of ... foreign government," *supra,* at 493, and in view of the pleaded facts, it is clear that the subpoena to discover USSF's bank records "may fairly be deemed within [the Subcommittee's] province." *Tenney* v. *Brandhove, supra,* at 378.

We conclude that the Speech or Debate Clause provides complete immunity for the Members for issuance of this subpoena. We draw no distinction between the Members and the Chief Counsel. In *Gravel, supra,* we made it clear that "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as [the Members'] alter egos . . . ." 408 U. S., at 616–617. See also *id.,* at 621. Here the complaint alleges that the "Subcommittee members and staff caused the . . . subpoena to be issued . . . under the authority of Senate Resolution 366 . . . ." The complaint thus does not distinguish between the activities of the Members and those of the Chief Counsel. Contrast, *Dombrowski* v. *Eastland,* 387 U. S., at 84. Since the Members are immune because the issuance of the subpoena is "essential to legislating," their aides share that immunity. *Gravel* v. *United States,* 408 U. S., at 621; *Doe* v. *McMillan,* 412 U. S., at 317.

## IV

Respondents rely on language in *Gravel* v. *United States, supra,* at 621:

"[N]o prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded

the privacy of a citizen. Neither they nor their aides should be immune from liability or questioning in such circumstances."

From this respondents argue that the subpoena works an invasion of their privacy, and thus cannot be immune from judicial questioning. The conclusion is unwarranted. The quoted language from *Gravel* referred to actions which were *not* "essential to legislating." *Ibid.* See *United States* v. *Johnson,* 383 U. S. 169 (1966). For example, the arrest by the Sergeant at Arms was held unprotected in *Kilbourn* v. *Thompson, supra,* because it was not "essential to legislating." See *Marshall* v. *Gordon,* 243 U. S. 521, 537 (1917). Quite the contrary is the case with a routine subpoena intended to gather information about a subject on which legislation may be had. See *Quinn* v. *United States,* 349 U. S. 155, 161 (1955).

Respondents also contend that the subpoena cannot be protected by the speech or debate immunity because the "sole purpose" of the investigation is to force "public disclosure of beliefs, opinions, expressions and associations of private citizens which may be unorthodox or unpopular." App. 16. Respondents view the scope of the privilege too narrowly. Our cases make clear that in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it. *Watkins* v. *United States,* 354 U. S., at 200; *Hutcheson* v. *United States,* 369 U. S., at 614. In *Brewster,* we said that "the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process *and into the motivation for those acts.*" 408 U. S., at 525 (emphasis added). And in *Tenney* v. *Brandhove* we said that "[t]he claim of an unworthy purpose does not destroy the privilege." 341 U. S., at 377. If the mere allegation that a valid legis-

lative act was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it. "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed." *Id.*, at 378. The wisdom of congressional approach or methodology is not open to judicial veto. *Doe* v. *McMillan*, 412 U. S., at 313. Nor is the legitimacy of a congressional inquiry to be defined by what it produces. The very nature of the investigative function—like any research—is that it takes the searchers up some "blind alleys" and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result.

Finally, respondents argue that the purpose of the subpoena was to "harass, chill, punish and deter" them in the exercise of their First Amendment rights, App. 16, and thus that the subpoena cannot be protected by the Clause. Their theory seems to be that once it is alleged that First Amendment rights may be infringed by congressional action the Judiciary may intervene to protect those rights; the Court of Appeals seems to have subscribed to that theory. That approach, however, ignores the absolute nature of the speech or debate protection [16]

---

[16] In some situations we have balanced First Amendment rights against public interests, *Watkins* v. *United States*, 354 U. S. 178 (1957); *Barenblatt* v. *United States*, 360 U. S. 109 (1959), but those cases did not involve attempts by private parties to impede congressional action where the Speech or Debate Clause was raised by Congress by way of defense. Cf. *United States* v. *Rumely*, 345 U. S. 41, 46 (1953). The cases were criminal prosecutions where defendants sought to justify their refusals to answer congressional inquiries by asserting their First Amendment rights. Different problems were presented from those here. Any interference with congressional action had already occurred when the cases reached us, and Congress was seeking the aid of the Judiciary to enforce its will. Our task was to perform the judicial function in criminal prosecu-

510

and our cases which have broadly construed that protection.

> "Congressmen and their aides are immune from liability for their actions within the 'legislative sphere,' *Gravel* v. *United States, supra,* at 624–625, even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe* v. *McMillan,* 412 U. S., at 312–313.

For us to read the Clause as respondents suggest would create an exception not warranted by the language, purposes, or history of the Clause. Respondents make the familiar argument that the broad protection granted by the Clause creates a potential for abuse. That is correct, and in *Brewster, supra,* we noted that the risk of such abuse was "the conscious choice of the Framers" buttressed and justified by history. 408 U. S., at 516. Our consistently broad construction of the Speech or

---

tions, and we properly scrutinized the predicates of the criminal prosecutions. *Watkins, supra,* at 208; *Flaxer* v. *United States,* 358 U. S. 147, 151 (1958); *Quinn* v. *United States,* 349 U. S. 155, 162, 169 (1955); *Hutcheson* v. *United States,* 369 U. S. 599, 630–631 (1962) (Warren, C. J., dissenting); 640 (DOUGLAS, J., dissenting). As Mr. Justice Frankfurter said concurring in *Watkins:*

"By . . . making the federal judiciary the affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt, Congress necessarily brings into play the specific provisions of the Constitution relating to the prosecution of offenses and those implied restrictions under which courts function." 354 U. S., at 216.

Where we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, balancing plays no part. The speech or debate protection provides an absolute immunity from judicial interference. Collateral harm which may occur in the course of a legitimate legislative inquiry does not allow us to force the inquiry to "grind to a halt." *Hutcheson* v. *United States, supra,* at 618.

Debate Clause rests on the belief that it must be so construed to provide the independence which is its central purpose.

This case illustrates vividly the harm that judicial interference may cause. A legislative inquiry has been frustrated for nearly five years, during which the Members and their aide have been obliged to devote time to consultation with their counsel concerning the litigation, and have been distracted from the purpose of their inquiry. The Clause was written to prevent the need to be confronted by such "questioning" and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority.[17]

## V

When the Senate case was in the Court of Appeals it was consolidated with three other cases [18] because it was assumed that "a decision in [the Senate] case might well control the disposition of [the others]." Those cases

---

[17] Although the Speech or Debate Clause has never been read so broadly that legislators are "absolved of the responsibility of filing a motion to dismiss," *Powell* v. *McCormack,* 395 U. S. 486, 505 n. 25 (1969); see *Tenney* v. *Brandhove,* 341 U. S., at 376–377, the purposes which the Clause serves require that such motions be given the most expeditious treatment by district courts because one branch of Government is being asked to halt the functions of a coordinate branch. If there is a dismissal and an appeal, courts of appeals have a duty to see that the litigation is swiftly resolved. Enforcement of the Subcommittee's subpoena has been restrained since June 1970, nearly five years, while this litigation dragged through the courts. This protracted delay has frustrated a valid congressional inquiry.

[18] *Progressive Labor Party* v. *Committee on Internal Security of the U. S. House of Representatives* (C. A. No. 71–1609); *National Peace Action Coalition* v. *Committee on Internal Security of the U. S. House of Representatives* (C. A. No. 71–1693); *Peoples Coalition for Peace and Justice* v. *Committee on Internal Security of the U. S. House of Representatives* (C. A. No. 71–1717).

involved subpoenas from the House Internal Security Committee to banks for the bank records of certain organizations. As in the Senate aspect of this case, the organizations whose bank records were sought sued, alleging that if the subpoenas were honored their constitutional rights would be violated. The issue of speech or debate protection for Members and aides is presented in all the cases consolidated in the Court of Appeals. However, the complaints in the House cases are different from the complaint in the Senate case, additional parties are involved, and consequently additional issues may be presented.

Progress in the House cases was suspended when they were in the pleading stage awaiting the outcome of the Senate aspect of this case. The issues in them, therefore, have not been joined. Additionally, it appears that the Session in which the House subpoenas were issued has expired. Since the House, unlike the Senate, is not a continuing body, *McGrain* v. *Daugherty,* 273 U. S., at 181; *Gojack* v. *United States,* 384 U. S. 702, 706–707, n. 4 (1966), a question of mootness may be raised. Moreover it appears that the Committee that issued the subpoenas has been abolished by the House, H. Res. 5, 94th Cong., 1st Sess., Jan. 14, 1975. In view of these problems, and because the House aspects of this case were not briefed or argued here, we conclude it would be unwise to attempt to decide any issues they might present that are not resolved in the Senate aspect of this case. *Powell* v. *McCormack,* 395 U. S., at 496 n. 8; *id.,* at 559 (STEWART, J., dissenting).

Judgment with respect to the Senate aspect of this case is reversed and the case is remanded to the Court of Appeals for entry of a judgment directing the District Court to dismiss the complaint. The House aspects of this case are remanded with directions to remand to

the District Court for further consideration consistent
with this opinion.

*Reversed and remanded.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE
BRENNAN and MR. JUSTICE STEWART join, concurring in
the judgment.

I agree with the Court that the Speech or Debate
Clause protects the actions of the Senate petitioners in
this case from judicial interference, and that the House
aspects of this case should be reconsidered by the District
Court.  As our cases have consistently held, however, the
Speech or Debate Clause protects legislators and their
confidential aides from suit; it does not immunize con-
gressional action from judicial review.  I write today
only to emphasize that the Speech or Debate Clause does
not entirely immunize a congressional subpoena from
challenge by a party not in a position to assert his con-
stitutional rights by refusing to comply with it.

I

When the Senate Subcommittee on Internal Security
subpoenaed the records of the bank account of respond-
ent USSF (hereinafter respondent), respondent brought
this suit in the District of Columbia against the Mem-
bers of the Subcommittee, its counsel, and the bank
to declare invalid and restrain enforcement of the sub-
poena.  Suit was brought in the District of Columbia
because the Court of Appeals for the Second Circuit had
held one week before in a suit against the same Sub-
committee and its counsel that jurisdiction and venue
lay only in the District of Columbia.  *Liberation News
Service* v. *Eastland,* 426 F. 2d 1379 (1970).  Having sued
in the District of Columbia, however, respondent found
that it could not get proper service on the New York

bank. Consequently, the only parties that it brought before the courts were the Senators and their counsel.

As the Court points out, the District Court properly entertained the action in order to provide a forum in which respondent could assert its constitutional objections to the subpoena, since a neutral third party could not be expected to resist the subpoena by placing itself in contempt. *Ante,* at 501 n. 14; see *Perlman* v. *United States,* 247 U. S. 7, 12 (1918); *United States* v. *Doe,* 455 F. 2d 753, 756-757 (CA1), vacated *sub nom. Gravel* v. *United States,* 408 U. S. 606 (1972); see also *United States* v. *Nixon,* 418 U. S. 683, 691 (1974). But a court's inquiry in such a setting is necessarily quite limited once defendants entitled to do so invoke the privilege of the Speech or Debate Clause, as was done here. If the Senators' actions were within the "legitimate legislative sphere," the matter ends there and they are answerable no further to the court. If their counsel's actions were in aid of that activity, then as a confidential employee of the Members, he is equally shielded from further judicial interference. Compare *Gravel* v. *United States, supra,* at 616-622, with *Doe* v. *McMillan,* 412 U. S. 306, 314-316 (1973).[1]

---

[1] *Dombrowski* v. *Eastland,* 387 U. S. 82 (1967), was a damages action against the same Chairman and Counsel Sourwine of the Senate Subcommittee on Internal Security, based on allegations of a conspiracy with state officials to violate the plaintiff's Fourth Amendment rights. The Court distinguished between the Senator and counsel, remanding only the case involving the latter for trial because there was disputed evidence in the record giving "more than merely colorable substance" to the claims against him, *id.,* at 84; the record contained no evidence of the Senator's involvement in any activity that could give rise to liability. The Court noted that the doctrine of immunity for acts within the legislative sphere is "less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves." *Id.,* at 85. In the present case, where counsel is alleged

The Court applies this well-settled doctrine to the present case and holds that since the issuance of the subpoena fell within the sphere of legitimate legislative activity, the proceedings against the petitioners must come to an end. I do not read the Court to suggest, however, nor could I agree, that the constitutionality of a congressional subpoena is always shielded from more searching judicial inquiry. For, as the very cases on which the Court relies demonstrate, the protection of the Speech or Debate Clause is personal. It extends to Members and their counsel acting in a legislative capacity; it does not preclude judicial review of their decisions in an appropriate case, whether they take the form of legislation or a subpoena.

## II

Modern legislatures, and particularly the Congress, may legislate on a wide range of subjects. In order to discharge this function, and their related informing function, they may genuinely need a great deal of information in the exclusive possession of persons who would not make it available except under the compulsion of a subpoena. When duly subpoenaed, however, such a person does not shed his constitutional right to withhold certain classes of information. If he refuses to testify or to produce documents and invokes a pertinent privilege, he still runs the risk that the legislature will cite him for contempt.[2] At trial he may defend on the basis of the constitutional right to withhold information from the legislature, and his right will be respected

---

only to have joined with the Senators in causing the subpoena to be issued, we have no occasion to distinguish between Mr. Sourwine and the Senators.

[2] In the federal system, this is done by the appropriate chamber referring the matter to the United States Attorney for presentation to a grand jury, indictment, and trial in the federal courts. See 2 U. S. C. §§ 192–194.

along with the legitimate needs of the legislature. As the Court said in *Watkins* v. *United States,* 354 U. S. 178, 188 (1957):

"The Bill of Rights is applicable to [congressional] investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged."

Accord. *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539 (1963); see *Quinn* v. *United States,* 349 U. S. 155, 161 (1955); Reinstein & Silverglate, Legislative Privilege and the Separation of Powers, 86 Harv. L. Rev. 1113, 1173–1176 (1973).

The Speech or Debate Clause cannot be used to avoid meaningful review of constitutional objections to a subpoena simply because the subpoena is served on a third party. Our prior cases arising under the Speech or Debate Clause indicate only that a Member of Congress or his aide may not be called upon to defend a subpoena against constitutional objection, and not that the objection will not be heard at all.

The privilege of the Speech or Debate Clause extends to Members of Congress when their action is "essential to legislating," in order to assure the independence of the legislators and their freedom from vexatious and distracting litigation. See *United States* v. *Johnson,* 383 U. S. 169, 180–182 (1966); *United States* v. *Brewster,* 408 U. S. 501, 512 (1972). Further, "a Member and his aide are to be 'treated as one'" under the Clause, "insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel* v. *United States,* 408 U. S., at 616, 618. At the same time, however, the Speech or Debate Clause does not insulate

legislative functionaries carrying out nonlegislative tasks. *Doe* v. *McMillan,* 412 U. S., at 315.

*Kilbourn* v. *Thompson,* 103 U. S. 168 (1881), was an action to recover damages for false imprisonment. The Court held that the Speech or Debate Clause afforded the defendant Members of Congress a good defense since they had taken no part in Kilbourn's arrest other than to vote that the Sergeant at Arms accomplish it. The Sergeant at Arms, however, was held to answer for carrying out their unconstitutional directive; and Kilbourn later recovered $20,000 from him. See *Kilbourn* v. *Thompson,* MacArth. & M. 401, 432 (Sup. Ct. D. C. 1883). The basis for the Court's holding was not, however, as the Court seems at one point to suggest, *ante,* at 508, that the arrest was inessential to legislating. We have already twice observed that the "resolution authorizing Kilbourn's arrest . . . was clearly legislative in nature. *But the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights as it did there.* That the House could with impunity order an unconstitutional arrest afforded no protection for those who made the arrest." *Gravel, supra,* at 618 (emphasis added); *Doe* v. *McMillan, supra,* at 315 n. 9.

### III

This case does not present the questions of what would be the proper procedure, and who might be the proper parties defendant, in an effort to get before a court a constitutional challenge to a subpoena *duces tecum* issued to a third party.[3] As respondent's counsel conceded at oral argument, this case is at an end if the Senate peti-

---

[3] See the opinion below, 159 U. S. App. D. C. 352, 370, 488 F. 2d 1252, 1270 (1973); *Liberation News Service* v. *Eastland,* 426 F. 2d 1379, 1384 n. 10 (CA2 1970); cf. *Stamler* v. *Willis,* 415 F. 2d 1365, 1369 (CA7 1969).

tioners are upheld in their claim of immunity, as they must be.[4]

MR. JUSTICE DOUGLAS, dissenting.

I would affirm the judgment below.

The basic issues in this case were canvassed by me in *Tenney* v. *Brandhove,* 341 U. S. 367, 381–383 (1951) (dissenting opinion), and by the Court in *Dombrowski* v. *Eastland,* 387 U. S. 82 (1967), in an opinion which I joined. Under our federal regime that delegates, by the Constitution and Acts of Congress, awesome powers to individuals, those powers may not be used to deprive people of their First Amendment or other constitutional rights. It is my view that no official, no matter how high or majestic his or her office, who is within the reach of judicial process, may invoke immunity for his actions for which wrongdoers normally suffer. There may be few occasions when, on the merits, it would be appropriate to invoke such a remedy. But no regime of law that can rightfully claim that name may make trustees of these vast powers immune from actions brought by people who have been wronged by official action. See *Watkins* v. *United States,* 354 U. S. 178, 198 (1957).

---

[4] In the House aspects of this case, where the banks to which the subpoenas were directed are within the jurisdiction of the District Court, this would not necessarily be true if that court were to determine that the issues are not moot.