**Franklin PEROFF, Plaintiff,**

v.

**Philip MANUEL and Elbert T. Phelps, Defendants.**

**Civ. A. No. 76–341.**

United States District Court, District of Columbia.

Oct. 27, 1976.

Harvey M. Katz, Washington, D. C., for plaintiff.

Robert N. Ford, Asst. U. S. Atty., Washington, D. C., for Philip Manuel.

## MEMORANDUM

GASCH, District Judge.

This is an action for money damages which was properly removed by one of the defendants from Superior Court pursuant to 28 U.S.C. § 1442(a)(1).[1] The plaintiff in this action is a former organized crime figure who has turned government informant and congressional witness. Defendants

Manuel and Phelps are, respectively, an investigator for the Senate Permanent Subcommittee on Investigations (hereinafter "Subcommittee") and a private medical doctor with an office at Georgetown Medical Center. Plaintiff's complaint charges defendants with blackmail, negligence, willful infliction of mental and physical distress and assault, all in connection with the defendants' alleged breach of the confidentiality of plaintiff's alias.

Defendant Manuel has moved to dismiss or, alternatively, for summary judgment, accompanying his motion with several affidavits. Plaintiff, in his opposition to the motion, relies upon his own affidavit. For the reasons set forth below, the Court finds that defendant Manuel's motion for summary judgment should be granted and that the action remaining as to defendant Phelps should be remanded to the Superior Court of the District of Columbia.

## FACTUAL BACKGROUND

Plaintiff is a former organized crime figure who has operated as an undercover agent for several government law enforcement agencies. His informant activities and subsequent testimony reportedly have contributed to the convictions of numerous international crime figures and the exposing of large international criminal conspiracies. In October of 1973, plaintiff apparently contacted the Subcommittee with the purpose of volunteering his testimony in exchange for government protection for himself and his family. That protection was ultimately arranged after plaintiff became the central figure in the Subcommittee's investigation of the role or organized crime in the proliferation of counterfeit or stolen securities.

During late 1973 and the first half of 1974, defendant Manuel and other Subcom-

---

1. The statute provides, in pertinent part, as follows:

(a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office . . ..

28 U.S.C. § 1442(a)(1).

Plaintiff did not oppose the removal.

mittee investigators were in almost constant contact with plaintiff. They engaged in the activities of interviewing him, corroborating his statements, and generally preparing him for his testimony before the Subcommittee. Of particular interest, the parties agree, was information known to plaintiff which suggested that officials of a federal agency (the Drug Enforcement Administration) might have allegedly "covered up" and abruptly aborted an investigation of the suspected criminal activity of Robert Vesco, a reported close friend of then-President Nixon. When it became clear, in December, 1973, that plaintiff and his family might be exposed to great danger because of plaintiff's expected testimony, they were placed under the protective custody of the United States Marshal's Service. It was at that time that plaintiff began using an alias provided him by the government.[2]

On or about March 30, 1974, defendant Manuel somehow became aware that plaintiff was in need of emergency medical care and made an arrangement for plaintiff to be treated by defendant Phelps. The facts surrounding this arrangement, and those facts surrounding the subsequent alleged conduct of the defendants with regard to the confidentiality of plaintiff's assumed name, are in dispute.

Plaintiff's version of the events in controversy is as follows: He says that as the date of his scheduled testimony before the Subcommittee approached, he became increasingly nervous, but that after he communicated this apprehension to defendant Manuel and another Subcommittee investigator, he scoffed at their suggestion that he should have medical attention and maintained that he needed nothing more than a mild tranquilizer. Subsequently, plaintiff

asserts, he received a telephone call from defendant Phelps who, he says, addressed him by his alias and said that defendant Manuel (with whom defendant Phelps was admittedly acquainted) had requested that he offer some medical attention to plaintiff. Plaintiff contends that this action was prompted by a telephone call made by defendant Manuel to plaintiff's wife, wherein she was allegedly advised that plaintiff was in need of medical attention and was prevailed upon to urge plaintiff to seek or be receptive to same. Plaintiff says that he was examined by defendant Phelps and experienced relief from any symptoms after taking the tranquilizer medication prescribed by him. (Although plaintiff nowhere mentions such facts, it is undisputed that he received extensive care from defendant Phelps, for both a colitis condition and a subsequently discovered nodule on his lung.)

Plaintiff contends that he was later informed by defendant Manuel that defendant Phelps needed to know plaintiff's true identity (Franklin Peroff) in order that his prior medical records could be consulted. Thereafter, plaintiff asserts, he was informed by defendant Phelps that defendant Manuel had indeed revealed this information to him.

When a dispute later arose over the bill for defendant Phelps' medical services,[3] plaintiff declined to pay that bill on the advice, he says, of the attorney handling his then-pending malpractice suit against defendant Phelps.[4] Plaintiff asserts that he subsequently received a telephone call from an individual who identified himself as "Mr. Lord" (apparently one Daniel Lord, General Manager of "Credit Recovery Bureau,

2. Upon plaintiff's motion, the Court has ordered physically stricken from defendant Manuel's motion and accompanying affidavit all mention of the alias name provided to plaintiff by the Department of Justice. Order of July 15, 1976.

3. Defendant Manuel has submitted some indirect but unrefuted documentation indicating that as of the end of 1975, plaintiff owed in excess of one thousand dollars each to defend-

ant Phelps and to Georgetown University Hospital. See Plaintiff's Exhibit # 17.

4. There is no indication in the record of the outcome of this suit, nor was any such information offered at oral argument. Counsel for defendant Manuel did, however, offer the telling observation that for a man so concerned with the confidentiality of his alias and secrecy of his whereabouts, plaintiff would seem to be most "litigious."

Inc.")[5] and said that he worked for a collection agency allegedly retained by defendant Phelps for the purpose of collecting this bill. Plaintiff asserts that this "Mr. Lord" stated to him that he had been told of plaintiff's true identity by defendant Manuel and that certain named members of international crime syndicates would be likewise informed unless the bill was immediately paid.[6]

Plaintiff states that subsequent to this conversation there were "two clear attempts to kill" him, which led him to relocate himself and his family at his own expense (apparently spurning the government's informant relocation program) and to abandon a business enterprise in which he assertedly had invested heavily. (Plaintiff's Affidavit, ¶ 10).

Defendant Manuel's version of the facts of the case disagrees with the above in many respects. He contends, for example, that it was plaintiff's wife who first *contacted him*, in late March, 1974, to state that plaintiff was seriously ill and in need of the immediate medical attention of a gastroenterologist. Moreover, he contends that after making a preliminary arrangement for plaintiff to receive treatment at a Public Health hospital in Baltimore, he was informed by plaintiff's wife that her husband refused such accommodations and that she therefore wanted defendant Manuel to assist in the location of a private physician who could treat plaintiff on an emergency basis. Defendant Manuel says that he consequently arranged for plaintiff to be treated by defendant Phelps, with whom he was acquainted through a mutual athletic interest.

Defendant Manuel insists that he at no time divulged plaintiff's true identity to defendant Phelps, nor did he attempt at any time to solicit plaintiff's permission to divulge said identity in connection with defendant Phelps' reported need to consult prior medical records. Rather, he asserts that defendant Phelps had advised him that plaintiff had of his own volition during the course of his medical treatment divulged his true identity to defendant Phelps, as well as relating to him many other aspects of his past and present activities.

Defendant Manuel further maintains that his only two connections with the attempted collection of defendant Phelps' bill arose when he attempted on one occasion to persuade plaintiff to pay defendant Phelps "a little something every month,"[7] and upon another occasion when Mr. Lord unsuccessfully requested his aid in approaching plaintiff.[8] Finally, defendant Manuel attests that he never divulged plaintiff's true identity or whereabouts to Mr. Lord, nor did he ever engage in a conspiracy or in any individual acts of threat or blackmail against plaintiff.

## THE MERITS

Defendant Manuel has raised a number of arguments in support of his alternative motions, including such issues as contributory negligence and general governmental immunity. These issues need not be reached, however, because the Court finds the somewhat narrower doctrine of con-

---

5. *See* Plaintiff's Exhibit # 17.

6. Although nowhere mentioned by the parties, it is presumed by the Court that plaintiff did not accede to any alleged pressure and has not paid the controverted bill.

7. Defendant Manuel's Affidavit, ¶ 43. Defendant Manuel attests that he had a telephone conversation with plaintiff in 1975 wherein he asked plaintiff to begin periodic payments on the disputed bill; he further attests that plaintiff agreed. *Id.*

 It is not without significance that plaintiff nowhere asserts that defendant Manuel exercised any threatening or otherwise improper influence during this admitted conversation. In fact, plaintiff's affidavit does not refer to this conversation at all.

8. Defendant Manuel attests that Mr. Lord called the Subcommittee office requesting information about "Frank Peroff" and that during their telephone conversation Mr. Lord requested his assistance in the collection of defendant Phelps' bill. Defendant Manuel further attests that he gave Mr. Lord no information concerning plaintiff and refused to advise him as to how he might proceed to collect the debt. Defendant Manuel's Affidavit, ¶ 46.

gressional immunity, when considered in conjunction with plaintiff's evidentiary burden as the opponent of the summary judgment motion, to be dispositive of the claim against defendant Manuel.

 Defendant Manuel argues that the claims against him are completely barred by the constitutional doctrine of congressional immunity under the Speech or Debate Clause, Art. I, § 6 of the Constitution, and places heavy reliance upon the case of *McSurely v. McClellan,* 172 U.S.App.D.C. 364, 521 F.2d 1024 (1975). There the Court of Appeals for this Circuit emphasized that the Speech or Debate Clause must be liberally construed and reaffirmed the well-settled principle that it provides an "absolute bar to interference" with the acts of legislators within the "legitimate legislative sphere." *Id.* at 1035–36. It is clear that such protection extends to "civil as well as criminal actions." *Eastland v. United States Serviceman's Fund,* 421 U.S. 491, 502–03, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975); *see Gravel v. United States,* 408 U.S. 606, 621–22, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). Further, there can be no question but that for purposes of this protection congressional aides and the Congressmen for whom they work are "treated as one," *see, e. g., Gravel v. United States,* 408 U.S. 606, 616, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), and that the preparation of a subcommittee witness by a congressional investigator undoubtedly falls within the protected "legislative sphere." [9] Hence, the Court in *McSurely* found that certain activities of the congressional investigator before it, because they were "facially legislative in character," were entitled to absolute protection under the congressional immunity doctrine. *McSurely, supra,* at 1038, 1047.

It is thus defendant Manuel's argument that his only contacts and dealings with plaintiff were pursuant to his official duties as a congressional investigator and that he therefore must be held immune from all consequences flowing from said contacts and dealings. The factual portion of this contention is, of course, crucial—especially considering that the argument is raised in the context of a motion for summary judgment. Yet defendant Manuel supports his position with the bald assertion that "[t]here can be no doubt as to the facts in this case." (Defendant Manuel's Memorandum at 5).

Plaintiff has rightfully responded to this broad claim by accurately pointing out that there are numerous important facts which are indeed very much in dispute. Although not contesting the breadth or general applicability of the congressional immunity doctrine in this case, plaintiff argues that he intends to prove at trial that defendant Manuel engaged in acts toward plaintiff (i. e., allegedly disclosing his true identity to Mr. Lord as part of a conspiracy to threaten plaintiff) which arguably were far outside the scope of his immunity.[10] Thus, plaintiff rests his opposition to defendant Manuel's motion on the proposition that the motion should not be granted on the basis of an immunity doctrine because it is not clear beyond a doubt that plaintiff can prove no set of facts which would entitle him to relief (i.e., facts which would place defend-

---

9. *See McSurely, supra,* at 1037. *See also Doe v. McMillan,* 412 U.S. 306, 312, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). In *McSurely,* the court of appeals elaborated as follows:

The gathering of such information [materials relating to an investigation], whether in preparation for a subpoena, an investigatory hearing, or a legislative report seems an integral part of Congress' investigative function and entitled to the same protection as the use of that information within Congress. The Supreme Court held the complaint in *Doe* barred by the Speech or Debate Clause not only as to the committee members and staff who utilized the sensitive materials in ques-

tion but also as to the investigator who procured those materials. There was no suggestion that any distinction could, or should, be made for the purpose of immunity between his investigation and their utilization of its product for the purposes of conducting a broad-based legislative inquiry.

512 F.2d at 1037 (footnote omitted).

10. Presumably, such acts would be arguably outside of the broader governmental immunity which was also invoked by defendant Manuel. As indicated *supra,* however, that question need not be reached.

ant Manuel outside of the protective scope of his immunity).

Although plaintiff is correct when he refers to the numerous disputed facts in this case, he nevertheless reveals a gross misunderstanding of the standards to be applied by this Court when considering the merits of a motion for summary judgment. The Court need not find "beyond a doubt" that plaintiff can prove no set of facts entitling him to relief before defendant Manuel's motion can succeed. Rather, the proper focus of this Court's concern when considering a party's motion for summary judgment is, of course, whether his opponent has successfully created (usually by way of affidavit) a genuine issue as to a material fact. Rule 56(c) of the Federal Rules of Civil Procedure.

In the instant case, the pivotal factual question is whether all of defendant Manuel's alleged conduct took place within the absolutely protected "legitimate legislative sphere." Hence, plaintiff should survive defendant Manuel's motion for summary judgment only if he has established a genuine factual dispute as to whether defendant Manuel's alleged conduct was entirely of a certain character so as to be entitled to absolute insulation from civil liability as a matter of law.

Plaintiff, in his pleadings, makes allegations which portray defendant Manuel as a malicious and vital participant in an alleged effort to coerce and intimidate him and to do great direct and indirect harm. The Court is of the opinion, however, that most of defendant Manuel's alleged actions toward plaintiff [11] took place well within the protective scope of his congressional immunity and are therefore not arguably actionable, no matter what motives may have underlay them.[12] *McSurely, supra,* at 1036. Hence, the only remaining material facts in the case are those aspects of defendant Manuel's alleged conduct toward plaintiff which are arguably beyond the scope of defendant Manuel's immunity as a congressional investigator. Falling into this material fact category are plaintiff's allegations that defendant Manuel provided plaintiff's true identity to Mr. Lord [13] and

---

**11.** Plaintiff's complaint and supporting affidavit contain a total of only three specific allegations of defendant Manuel's wrongful conduct. Firstly, plaintiff directly challenges defendant Manuel's version of the events leading up to and including the arrangements for plaintiff's treatment by defendant Phelps (Plaintiff's Affidavit, ¶¶ 3–4) and seemingly charges defendant Manuel with negligence in his selection of that particular doctor (Complaint, ¶ 4). Secondly, plaintiff contends that defendant Manuel requested his permission to provide defendant Phelps with plaintiff's true identity in connection with the need to consult plaintiff's prior medical records and did, in fact, ultimately provide that information to defendant Phelps. Even accepting these allegations as true, however, they deal with conduct undertaken pursuant to defendant Manuel's duties as a Subcommittee investigator and certainly well within his general responsibilities in the preparation and care of plaintiff prior to his critical upcoming testimony. Whatever may be said of the wisdom of defendant Manuel's choice of defendant Phelps to treat plaintiff and his alleged subsequent communication to defendant Phelps in connection with plaintiff's immediate medical needs, it still remains that such actions, if taken, were in accordance with the Subcommittee's particularly pressing need for plaintiff to be in sound health at that precise time and were therefore "facially legislative in character." *McSurely, supra,* at 1038.

Plaintiff's third set of specific allegations, that defendant Manuel conspired to threaten and otherwise to harm him and that he provided information to Mr. Lord in furtherance of said conspiracy (Complaint, ¶ 7; Plaintiff's Affidavit, ¶ 8), involves conduct which is arguably beyond the scope of defendant Manuel's immunity. As demonstrated *infra,* however, plaintiff has failed to meet his evidentiary burden as to these allegations.

**12.** In *McSurely, supra,* this specific point was addressed as follows:

The Speech or Debate Clause, then, provides protection to Members of Congress and their aides who are engaged in the process of legislating. It is a functional immunity, extended whether or not their acts are in fact motivated by the desire to forward Congress' business.

521 F.2d at 1036.

**13.** Defendant Manuel attests that not only did he refuse to assist Mr. Lord in any way but that he did not at that time believe that he knew of plaintiff's location or current alias. He attests that he at that time presumed that plaintiff had been relocated by the government and was now using a new alias, not realizing that plaintiff was still using his original alias at the same

further "offered Lord his full support in collecting the Phelps bill" in furtherance of the alleged conspiracy to threaten and otherwise to harm plaintiff. (Plaintiff's Affidavit, ¶ 8). The determinative question facing the Court thus becomes: Has plaintiff in his opposition documentation properly placed at issue these material allegations? The Court finds that he has not.

As noted above, plaintiff relies exclusively upon his own affidavit in his opposition to defendant Manuel's motion. In it, he expressly disputes a number of his opponent's factual contentions. Most of these facts, as described above, pertain to aspects of defendant Manuel's alleged conduct which fall within the "legitimate legislative sphere."[14] The remainder of those facts (specifically, what defendant Manuel told Mr. Lord and whether defendant Manuel conspired with Lord and defendant Phelps to do plaintiff great harm) are the only true material facts in plaintiff's case against defendant Manuel. As to these facts, plaintiff's affidavit reads as follows:

> Some time later, I received a telephone call from an individual who identified himself as Mr. Lord and who said he worked for a collection agency that had been retained by Phelps. This individual then said that he had spoken to Manuel; he said that Manuel told him that I was Frank Peroff, that my life would be in jeopardy should my identity and whereabouts be revealed to certain people. Lord said that Manuel had offered Lord his full support in collecting the Phelps bill. Lord said that he was acquainted

with several people in international crime syndicates, some of whom he named, and he threatened to call them and tell them where I was unless I paid the Phelps bill. (Plaintiff's Affidavit, ¶ 8).

This excerpt marks the only place at which plaintiff has attempted properly to create a genuine issue as to a material fact.[15] Yet this portion of plaintiff's affidavit does not "set forth such facts as would be admissible in evidence" as required by Rule 56(e) of the Federal Rules of Civil Procedure because it is clearly hearsay not admissible under any exception.[16] Thus, plaintiff has utterly failed to meet his obligation to properly "set forth specific facts showing that there is a genuine issue for trial"[17] and defendant Manuel is therefore entitled to summary judgment as a matter of law.

■ Finally, the Court notes that the judgment granted in favor of defendant Manuel herein removes from the case the very party whose presence established federal jurisdiction,[18] thus presenting the Court with the anomolous situation of considering a suit over which it would not have otherwise had jurisdiction. Although it would appear that a federal court may retain jurisdiction over a properly removed action notwithstanding a subsequent change in parties,[19] the Court is of the opinion that plaintiff's remaining cause of action as against defendant Phelps should be remanded back to the Superior Court. *See Herman Andrae Electrical Co. v. Freiberg,* 332 F.Supp. 858, 859 (E.D.Wisc.1971); *see also Martinez v. Seaton,* 285 F.2d 587,

---

address in Virginia. Defendant Manuel's Affidavit, ¶ 46.

**14.** *See* note 11 *supra* and accompanying text; *see also* note 9 *supra* and accompanying text.

**15.** In Plaintiff's "Statement of Material Facts in Dispute," he declares his intention to prove these remaining material facts at trial. He fails, however, to properly reference these alleged facts to "the parts of the record relied on to support such statement[s]," as required by Local Rule 1–9(h). The simple fact is that there *is no* documentation submitted by plaintiff properly to place at issue a material fact; it would appear that only the testimony (by ei-

ther affidavit or deposition) of the mysterious Mr. Lord could effectuate that end.

**16.** Plaintiff's statement that Lord told him what defendant Manuel had told Lord is offered for the truth of what defendant Manuel told Lord. As such, it is inadmissible hearsay. *See* Federal Rules of Evidence, Rules 801–04.

**17.** F.R.C.P. Rule 56(e).

**18.** *See* note 1 *supra* and accompanying text.

**19.** *See, e. g.,* 1A Moore's Federal Practice ¶ 0.157[12], at 155 (1974).

589–90 (10th Cir.), *cert. denied sub nom. Martinez v. Udall,* 366 U.S. 946, 81 S.Ct. 1677, 6 L.Ed.2d 856 (1961); *Pennsylvania Turnpike Comm'n v. McGinnes,* 179 F.Supp. 578, 583 (E.D.Pa.1959).