[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO DISMISS
In November of 1992 the so-called "Constitutional Spending Cap Provision" was enacted and it reads as follows:
 The general assembly shall not authorize an increase in general budget expenditures for any fiscal year above the amount of general budget expenditures authorized for the previous fiscal year by a percentage which exceeds the greater of the percentage increase in personal income or the percentage increase in inflation, unless the governor declares an emergency or the existence of extraordinary circumstances and at least three-fifths of the members of each house of the general assembly vote to exceed such limit for the purposes of such emergency or extraordinary circumstances. The general assembly shall by law define "increase in personal income", "increase in inflation" and "general budget expenditures for the purposes of this section and may amend such CT Page 12040 definitions, from time to time, provided general budget expenditures shall not include expenditures for the payment of bonds, notes or other evidences of indebtedness. The enactment or amendment of such definitions shall require the vote of three-fifths of the members of each house of the general assembly.
As the defendants point out essentially this provision prohibits the legislature from authorizing an increase in "general budget expenditures" which exceeds either the percentage "increase in personal income" or the percentage "increase in inflation" whichever is greater, barring an emergency.
In this case a group of Connecticut taxpayers have brought a suit seeking declaratory and injunctive relief which would require the general assembly to enact legislation implementing the constitutional provision. The defendants named in the suit are the State of Connecticut, the General Assembly, the State Senate, the House of Representatives, the Speaker of the House, the President Pro Tem, the Treasurer, and the Comptroller.
The plaintiffs allege that since the amendment was adopted the general assembly "has failed and refused" to enact the definitions contained in the provision and that the speaker and president pro tem refused to use their "emergency certification" powers to place "any bill" defining the relevant terms on the House or Senate calendar (see paragraphs 20 and 21 of the Amended Complaint).
In paragraphs 23 and 28 of the Amended Complaint the plaintiffs allege that 1993-1994 budget violates the constitutional cap. The state budget adopted for this fiscal year exceeds the 1992-1993 budget by 7.2% "which increase exceeds any reasonable or rational definition of `increase in inflation' or `increase in personal income.'" (par. 28). Thus say the plaintiffs in the latter paragraph "the defendants have violated the clear mandate of Article III, section 18(b) and the will of the people of the state of Connecticut as expressed by their overwhelming approval of the spending cap amendment." CT Page 12041
The plaintiffs seek a Declaratory Judgment determining that the general assembly must define by statute the operative terms of the constitutional amendment — "general budget expenditures", "increase in personal income", and "increase in inflation" — before they adopt or enact a budget for the fiscal year 1994-1995 and any subsequentfiscal years or any interim appropriation tax or other fiscal measure which levies or expends tax revenue. On April 8, 1994 the court permitted the plaintiffs to amend the complaint to add the language subsequent fiscal years; this seemed fair because this matter should not become moot because the court has taken a lengthy period of time to resolve what is an important matter[.]
Further the plaintiffs request the court to determine that these same defendants be enjoined from allocating or spending for "general budget expenditures" for the fiscal years 1994-1995 and subsequent fiscal years more than the amount for such expenditures in fiscal year 1992-1993 until the above-mentioned terms are defined. The court for the reasons noted above allowed an amendment as to "subsequent fiscal years", and similarly as to same language in the next mentioned request for an injunction.
The plaintiffs also request that the Comptroller and Treasurer be enjoined from disbursing funds for "general budget expenditure" for the fiscal year 1994-1995 and subsequent fiscal years in an amount more than the amount authorized for "general budget expenditures" in fiscal year 1992-1993 unless and until the general assembly has defined by law the previously mentioned terms. The plaintiffs originally asked for then withdrew their request for attorneys' fees but do ask for costs.
1.
The defendants have moved pursuant to Section 143 of the Practice Book to dismiss the complaint.
Central to the resolution of this motion is the problem of justiciability. If this matter is non-justiciable the motion should be granted.
The defendants have made two arguments that from the CT Page 12042 court's perspective are intertwined with the question of justiciability. They claim the suit is "barred by the legislative immunity contained in Article III, § 15, the so-called `speech and debate' clause . . . . The action is against the state legislature and its leaders for allegedly failing to meet their responsibilities in enacting legislation" — such an action is precisely the type of action barred by legislative immunity.
In a further argument that the court considers ancillary to the justiciability question the defendants claim that this action is barred by the doctrine of sovereign immunity. This is really a suit against the state say the defendants, the legislature and its leaders are nominal parties with the state named in its sovereign capacity — "it is axiomatic that the state itself or a body of the state (e.g., the legislature) cannot be sued without its consent."
Appropriate cases citing these general propositions are cited by the defendants. For the speech and debate clause argument cases such as U.S. v. Brewster, 408 U.S. 501,516 (1972) are cited; the "speech and debate clause" in the federal constitution is similar to ours and has the same goals. Reliance is placed on Consumer Party ofPennsylvania v. Commonwealth, 507 A.2d 323 (1986) a Pennsylvania case which relied on its interpretation of the federal provision in interpreting the speech and debate clause in its constitution, id. at page 330.
For the sovereign immunity argument the defendants rely chiefly on their interpretation of Horton v. Meskill,172 Conn. 615 (1977). Ex Parte Young, 209 U.S. 123, 157
(1908) is also referred to where the court says:
 "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act or else it is merely making him a party as a representative of the state and thereby attempting to make the state a party." CT Page 12043
Federal case law is relevant on this aspect of the sovereign immunity question, State v. Giant's Neck Land Improvement Co., 116 Conn. 119, 123 (1933). Under the holding of Horton an Ex Parte Young the defendants go on to claim that:
 ". . . not only must there be a state officer who has a connection with the enforcement of the challenged [action] but there must also be a real, not ephemeral, likelihood or realistic potential that the connection will be employed against plaintiffs' interests,"
Allied Artists Pictures Corp. v. Rhodes, 473 F. Sup. 560, 568
(S.D. Ohio, 1979).
The defendants rely on this language to argue that the state, the general assembly and the State House and Senate as public bodies may not be sued in their own name because to avoid a sovereign immunity claim an action must allege a state officer is liable for unconstitutional acts. As to the comptroller and treasurer, so the argument goes, they "are merely following the directives of the state legislature. Plaintiffs make no allegation nor have these defendants committed any violations of law, constitutional or otherwise. No claim is made therefore that any individual defendant . . . acted pursuant to an unconstitutional statute or in excess of their statutory authority."
But the defendants' argument on the issue of sovereign immunity is too selective. The complete language of Hortonv. Meskill, must be quoted to put the plaintiffs' position in context. At page 615 the court, referring to an article by Professor Block at 59 Harv.L.Rev. 1060, 1061, says:
 "As the author of that article makes clear, adherence to the doctrine of sovereign immunity does not mean that all suits against government officers, since they are in effect suits against the government, must be barred. As he suggests (p. 1080): "In those cases in which it is alleged that the defendant officer is CT Page 12044 proceeding under an unconstitutional statute or in excess of his statutory authority, the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine. Moreover, the government cannot justifiably claim interference with its functions when the acts complained of are unconstitutional or unauthorized by statute. On the other hand, where no substantial claim is made that the defendant officer is acting pursuant to an unconstitutional enactment or in excess of his statutory authority, the purpose of the sovereign immunity doctrine requires dismissal of the suit for want of jurisdiction."
That is, the plaintiff's position is that by failing to define the terms in the 1992 constitutional amendment the defendants are violating the constitution either in the sense that (1) the failure to so act is in itself a constitutional violation or (2) in authorizing any expenditures since the effective date of the amendment to the constitution they are in effect violating the constitution by failing to keep the scope of such expenditures within the requirements that the amendment demands. In other words the sovereign immunity issue is inextricably bound up with the claim that the defendants have acted unconstitutionally and the question of justiciability. A similar observation can be made as to the defendants' reliance on the speech and debate clause. Justice Marshall made two pertinent observations inCortland v. United States Servicemen's Fund, 421 U.S. 491
(1975): . . . "the speech or debate clause protects legislators and their confidential aides from suit, it does not immunize congressional action from judicial review." id. at page 513.
 . . . "the protection of the speech or debate clause is personal. It extends to members and their counsel acting in a legislative capacity, it does not preclude judicial review of their decisions in an appropriate case whether they take the form of legislation or a subpoena."
Id. at page 515. CT Page 12045
To shift focus for a moment, this action would be non-justiciable if it can be said to present a political question which is "a convenient shorthand for declaring that some other branch of government has constitutional authority over the subject matter superior to that of the courts", Pellegrino v. O'Neill, 193 Conn. 670, 680 (1984). Thus "The non-justiciability of a political question is primarily a function of the separation of powers." Bakerv. Carr, 369 U.S. 186, 210 (1961). But the purposes found to underlie the speech or debate clause in the federal and thus the state context closely parallel underlying political question policy — i.e., the separation of power. See comment in Federal Practice Procedure, Wright, Miller, Cooper, Vol. 13a, § 3534.1, footnote 24, page 470 commenting on Eastland v. U.S. Servicemen's Fund, supra. This is necessarily so since questions of immunity under the speech or debate clause involve determinations of what is "the legitimate legislative sphere's of activity subject to protection, 421 U.S. at page 503.
All of which goes to say that the primary task for a court facing these issues is to go directly to the justiciability problem. The sovereign immunity and speech and debate clause questions are part and parcel of the issues that must be faced in dealing with that issue. Or, to put it another way, if constitutional questions must be decided and constitutional or statutory violations are involved and the vindication of these concerns find an appropriate forum in the courts, incantations by defendant governmental officials about sovereign immunity and speech or debate clause immunity will be swept aside and the courts will find an appropriate state official or body against which relief will lie and this to be folowed [followed] by or otherwise implement the relief themselves.[1]. After this the discussion in section 2 follows.
2.
Should this action then be dismissed because of a lack of justiciability? Is there a political question involved such that another branch of government — the legislature — has constitutional authority as to the subject matter superior to that of the courts? See Pellegrino v. O'Neill,193 Conn. 670, 680 (1984). The Pellegrino court in its CT Page 12046 discussion of justiciability refers to the following language from Baker v. Carr, 369 U.S. 186, 217 (1962) where after noting non-justiciability of political questions is primarily a function of the separation of powers the court said:
 Prominent on the surface of any case held to involve a political question is found a textually demonstrable commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. (Emphasis added)
This court has relied on the general discussion inFederal Practice Procedure, Wright, Miller, Cooper, Vol. 13A, § 3534, pp. 450 et seq. to categorize the types of cases that arise under the justiciability-political question doctrine.
First, both sides in this case resort to state cases that have dealt with these issues as if the legal questions presented were fungible and out there somewhere is a political question doctrine" which a court can turn to whenever a justiciability claim is presented. The justiciability question and factors to be taken into account to decide that question are not the same in Hortonv. Meskill, 172 Conn. 615 (1977) as they are in State v.Sanabria, 671 (1984) or as they are in Pellegrino v.O'Neill, 193 Conn. 670 (1984). Language and nuances in one case are not appropriate to dealing with a justiciability CT Page 12047 issue in another case. That is so because we are dealing with separation of power questions, the propriety of judicial intervention in executive areas of activity as opposed to legislative activity, the greater need perhaps for judicial intervention where individual rights are at stake.
 "Although much has been written of political questions there is no workable definition of characteristics that might be found to distinguish political questions from judicial questions. It remains accurate to observe that the category of political questions is `more amenable to description by infinite itemization than by generalization."
Federal Practice Procedure, supra, § 3534 at p. 452.
What are the types of cases where the courts have not intervened due to a finding of non-justiciability? The political question issue is really not related to any reluctance courts might have to involve themselves in political controversy and heated popular issues. In some areas the courts have intervened although it puts them in the middle of the political fray. Thus in Baker v. Carr,369 U.S. 186 (1962) although the court didn't explicitly say so intervention was necessary and the matter was justiciable because without judicial intervention the very integrity of the political system was endangered and the very nature of the inequity — denial of equal representation — made the legislative branch incapable of correcting the problem because individual legislators benefited from the inequity. That is, superior to every consideration is the need to preserve and protect the democratic structure, the legislative branch in an important area couldn't act, so how could it be said separation of power doctrine should have restrained the courts from acting. The same considerations warrant an easy dismissal of political question claims in voting rights cases where racial or other forms of discrimination are involved — the very people who may owe their place to the discriminatory system can't be expected to act so the courts must; Wright notes that many of these cases are CT Page 12048 decided on the merits and claims are rejected that political question are involved.
Also federal courts have not been reluctant to reject political question claims in cases which put the courts in the midst of the political fray but involve disputes between the executive and the legislative branches. Such disputes go to the heart of the functioning of the federal and state system and no mechanism except the courts exists to resolve conflicts that otherwise might have to be decided extra-constitutionally, see The Pocket Veto Case,279 U.S. 655 (1929), Senate Select Committee v. Nixon,370 F. Sup. 521, aff'd 498 F.2d 725 (C.A.D.C., 1974).
Wright also makes the important point that: "the fact that protection of individual rights may lead deep into the affairs of another branch is not of itself controlling" id § 3534.1, page 491. He noted that there are numerous cases which protect individual rights against legislative and executive action and don't even mention the doctrine.Illinois Migrant Council v. Pilliod, 540 F.2d 1062, 1067
(CA 7, 1976); some of these cases may reject the plaintiff's claim but they deal with the cases on the merits and don't refuse consideration on political question grounds. Matthews v. Biaz, 426 U.S. 787 (1977). The need for judicial intervention in cases involving deprivation or injury to individual rights is obvious because the individual considered alone or often as a member of a minority class of people deprived of certain rights may otherwise find it impossible to seek redress for grievances in disputes with the executive or legislative branch. In this sense Horton v. Meskill, supra, represented an appropriate area for court intervention; the individual rights of children were being denied; they had a fundamental right to education thus strict judicial scrutiny could be exercised by the courts to see if legislation enacted to effectuate that right passed equal protection muster. It was also true there that the legislative process offered little hope of correcting the problem since well-off towns had a disincentive to change the system. In fact the justiciability issue is not a major topic of discussion in Horton v. Meskill probably because of these considerations.
The issues behind court intervention in the types of CT Page 12049 cases just discussed becomes especially difficult when, as here, a political question claim is raised in a suit asking the judiciary to take actions to compel legislative action or otherwise correct a situation brought about as a result of legislative inaction. For one thing, I do not see here structural problems in the very constitution of the legislature or something about the inaction by the legislature that deleteriously affects the rights of individuals or discrete minorities that would impel a court to treat lightly any political question claim let alone summarily reject it.
It is exactly because this action seeks judicial intervention directed toward legislative inactivity and represents an attempt to secure certain legislative action that other issues come into play which are central to our democratic system. It is interesting to note that the plaintiffs here who throughout their excellent and learned brief base their demand on the right of the people to be heard and have their will obeyed, seek relief from an appointed judiciary rather than relying on the ballot box to punish by removing from office those legislators and state officials who fail to enact the provisions that will effectuate the constitutional amendment.
As Wright notes: "Challenges to executive action ordinarily present few political questions apart from foreign affairs", id. § 3534.1, p. 472. That is so because the "executive" the cases talk about often is represented by a civil service bureaucracy not otherwise amenable to popular control and sometimes acting to impair individual rights.
I agree with the plaintiffs that in a democratic state the popular will is paramount. But it is exactly because this action seeks judicial intervention prompted by and directed to legislative failure to act and because it seeks to secure certain legislative action that a court should be cautious in intervening[2] — that caution is expressed in legal terms by a finding of non-justiciability. This concern over justiciability when court intrusion into the legislative branch is contemplated, I believe, lies at the basis of the analysis the courts have developed to determine whether a constitutional provision is self-executing or nonself-executing. If a constitutional CT Page 12050 provision is self-executing, then no political question objection can be raised against an action to enforce the provision because the people have clearly spoken and their will must be enforced.
If a provision is nonself-executing then the question becomes, should the matter be decided by a non-elected member of the judiciary or should the issue be referred to the legislature whose members can be removed from office by the ballot box if the people determine their will is being thwarted.
It is against that background that the premise for deciding these political question issues set forth in Bakerv. Carr, supra, must be approached — is there "a textually demonstrable commitment of the issue to a coordinate political department? id. at page 217.
This constitutional amendment explicitly provides that its operative terms must be defined by the legislature. "General budge [budget] expenditure", "increase in personal income", "percentage increase in inflation" are not words of art whose meaning is generally accepted in the economic or political community. There has been fierce debate nationally on whether, for example, increased housing costs should be factored into the inflation rate since such costs don't affect a large portion of the population; what is meant by personal income-disposable income or capital accumulation; what are general budget expenditure, do they include capital expenditures, some or all of them, what are capital expenditures? How can a court functionally decide these issues, how can it purport to act as a substitute for an elected legislature? It must be remembered that the ability or inability of the legislature to resolve differences about these interpretations will have a direct effect on the size of any budget which means in practical terms whether, for example, the state police will get more or less money for any fiscal year, whether the human resources department will receive more or less funds for children's programs, etc., ad infinitum. The amendment could have defined these terms by reference to federal definitions, it attempted to give some definition by way of exclusion to general budget expenditures but it did not define these terms and left it to the legislature to do so. CT Page 12051
Apparently there were some steps taken in a recent legislative session to define these terms but those efforts were unsuccessful.
But the fact that the legislature has not taken action is not necessarily a reflection of its lack of desire to achieve a spending cap but could just as well reflect a difference of opinion as to the definitional components necessary to define that cap in light of the obvious effect that such a cap will have on the government and people of this state. That these were important considerations and that the promulgators of the amendment and the people who voted for it thought so is underlined by the fact that the amendment requires a three-fifths vote of the legislature not a simple majority to enact the definitions. Given all this, failure of the legislature to reach a supra-majority consensus and define these terms is just as much an expression of the popular will as if they had been able to effectuate the amendment. And how am I to resolve these questions? Should the legislators be brought in one at a time for questioning as to their motives for not acting on this amendment — was it because they didn't want any spending cap? Was it because they wanted one but couldn't agree on the definitions because they knew the spending cap and thus any ensuing budget would be greatly affected by the definition? Is that a "permissible" position for them to take? If not, why is a three-fifths majority required?
Some of the concerns I've been raising border on what has been called a functional analysis of this issue. That, I believe, is an important consideration in cases of this type. In Horton v. Meskill, supra, the fundamental right the court was concerned with was the right to free elementary and secondary education but the issue which the court felt capable of deciding was one that declared that this right must be enjoyed under the provisions of the equal protection clause and any inequality in the enjoyment of that rights must be justified by a compelling state interest. Not only were individual rights of children concerned, the most important rights in any society, but the court could apply an equal protection analysis based on differences in expenditures for pupils — the type of analysis courts have been using for decades under the equal protection clause. Similarly in State v. Sanabria,192 Conn. 671 (1984) the court commented in footnote 16 at CT Page 12052 pages 690-691 that if the legislature didn't establish the procedural rules to effectuate the grand jury amendment in a reasonable time then the Superior Court judges could promulgate such rules or the Supreme Court itself could do so. But procedural rules in probable cause hearings are certainly within the expertise of judges.
I agree with the plaintiffs' analysis of Sanabria then that the fact that a particular constitutional amendment is not self-executing, does not make an action such as this nonjusticiable, and thus a political question. But the court did not indicate thereby that it was abrogating the political question doctrine — in other words, the court was saying we will act to implement an amendment if the legislature hasn't acted in a reasonable time but this is based on the assumption that we, as a court, can ourselves provide the relief necessary to effectuate the amendment. That question again depends on the particular amendment involved and what is necessary to effectuate it — it cannot be resolved by referring to general language extracted from different cases whose only connection is that they raise justiciability issues under the political question doctrine.
In her dissent in Pellegrino v. O'Neill, 193 Conn. 570
(1984), Justice Peters said that "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations", citing Hishon v. King Spalding, 467 U.S. 69, 73 (1984). She dissented from the result reached by the majority but apart from the merits of its application in Pellegrino the language of the majority is instructive as to whether any of the relief requested or suggested by the plaintiffs in this case could be said to forestall the political question problem. Justice Shea, referring to the plaintiffs, said the following:
 "They suggest that the trial court should have rendered a declaratory judgment on that issue as presented, leaving the problem of relief for some later proceeding in the event that the legislature should fail to act. Although a similar procedure was approved in Horton v. Meskill, 172 Conn. 615, 650-51, 376 A.2d 359 (1977), implicit in that decision to stay the hand of the judicial CT Page 12053 department in order to give the legislative branch an opportunity to solve the problem of unequal educational financing was the assumption that, if necessary, appropriate relief could be fashioned by a court within its constitutional bounds. "Courts sit to determine causes and to enforce their determination. It is a general rule that what they cannot enforce they cannot decree." Clarke's Appeal from Probate, 70 Conn. 195, 209, 39 A. 155 (1898). It is not our function to render opinions which are simply advisory. Reply of the Judges, 33 Conn. 586 (1867). In Horton the court had before it various statutory grants for public schools and it concluded that those legislative provisions for financing education in the state violated the provisions of the Connecticut constitution. Horton v. Meskill, supra, 650. Rather than enjoin the defendants from implementing the existing statutory financing scheme, the customary remedy in such a situation as sought in one of the prayers for relief, the court chose to defer any such action until the legislature had considered the matter further. Id., 618, 653. The case was clearly one where a judicial remedy could have been applied, although its scope would necessarily be far more limited than a solution which the legislature might devise.
Id. at page 583.
For the reasons previously mentioned this language reflects the reasons why I believe the plaintiffs should not prevail on the issue of justiciability.
In their analysis the plaintiffs put great weight on the Kentucky case of Rose v. Council for Better Education,790 S.W.2d 186 (1989) especially as to the scope and method of judicial relief as they relate to the justiciability issue.
In Rose v. Council for Better Education, the court was dealing with a constitutional amendment that provided:
 "The general assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the state." (Ky. Const. Sec. 183)
The court upheld the actions of the trial court which CT Page 12054 did an in-depth analysis of the school system and heard from numerous experts and agreed with the trial court which found that the common school finance system was unconstitutional and discriminatory and went much further in also finding that the legislature had not produced an efficient system of common schools in the state as it was constitutionally required to do. The court proceeded to define the essential and minimal characteristics of an "efficient" school system, id. page 212, held that the present one was not and rejected justiciability objections to the actions of the trial court in making what was in effect a continuing order to the legislature to create an "efficient" school system.
The Rose case is about as far as one can go in rejecting justiciability claims but the Rose case is not this case. Rose involved a claim that the individual rights of children were being ignored. The Kentucky Supreme Court commenting on the trial judge's order said the following:
 "The implications of such an open-ended judgment are very clear. The trial court retains jurisdiction and supervision of the general assembly's effort to provide a constitutional system of common schools. Under such an order the general assembly in theory if not in practice, would literally have to confer, report, and comply with the judge's view of the legislation proposed to comply with the order. The legislation would be that of the joint efforts of the general assembly and the trial court with the latter having the final word."
Id. at page 214.
Arguably there is a definition of an "efficient" school system upon which experts can agree. From reading the opinion a non-discriminatory funding system would meet several of the criteria of an "efficient" school system set out by the Kentucky court. CT Page 12055
My problem is that all the experts in the world or all the efforts by the Connecticut legislature with the greatest good faith imaginable won't enable this court to define what "general budget expenditure", "increase in inflation", or "increase in personal income" mean or, more exactly, should mean in light of the effect of enacting such definitions on any current or future budget. There is simply a "lack of satisfactory criteria for a judicial determination", a dominant consideration in political question cases, Coleman v. Miller, 307 U.S. 433,454-455 (1939). Without those criteria how is the failure of the legislature to act to be judged and what is the court to do if ultimately it doesn't act? Cast in the role of Caeser [Caesar] I will have no legions nor even a safe avenue of retreat.
The Kentucky constitution didn't ask the legislature to define the term "efficient school system" or set forth component definitions which being made by the legislature would in effect define that term. Neither did it say any definition must be enacted by a three-fifths majority of the legislature. The Kentucky constitution in a pronouncement that affected the rights of children gave the legislature no option but to create an efficient school system.
Our amendment left to the legislature the task of defining terms which by their nature are amenable to political give and take in their formulation and then went on to say that even if you reach definitions the amendment won't be effectuated — assumedly because of the important consequences it will have — unless three-fifths of you can agree.
It would be difficult to envision language that more explicitly made a "textually demonstrable constitutional commitment of the issue to a coordinate political department."
Not all constitutional questions can be resolved in the courts. Some issues must be resolved by the people through the ballot box. The right of the people to so act can sometimes be thwarted by inappropriate judicial intervention. In a tale that must be apocryphal but CT Page 12056 a useful one, it is said that a woman ran up to Benjamin Franklin as he was leaving Independence Hall inquiring about the constitutional document just passed by the convention. She asked, "Dr. Franklin, what kind of government have you given us?" He replied, "A Republic, Madame, if you can keep it."
I believe this is one of those issues whose resolution is best-left to the legislature and thus to the electorate who can remove or re-elect its members depending on their performance as to this amendment.
The motion to dismiss is granted.
Corradino, J.