**Michael A. NEWDOW,**

**Plaintiff–Appellant,**

**v.**

**US CONGRESS; United States of America; William Jefferson Clinton, President of the United States; State Of California; Elk Grove Unified School District; David W. Gordon, Superintendent EGUSD; Sacramento City Unified School District; Jim Sweeney, Superintendent SCUSD, Defendants–Appellees.**

No. 00–16423.

United States Court of Appeals, Ninth Circuit.

March 14, 2002

June 26, 2002.

Michael Newdow, Pro Se, Sacramento, California, the plaintiff-appellant.

Kristin S. Door, Assistant United States Attorney, Sacramento, California, Lowell V. Sturgill, Jr., Department of Justice, Washington, D.C., for federal government defendants-appellees; A. Irving Scott, Terence J. Cassidy, Porter, Scott, Weiberg &

**600**

Delehant, Sacramento, California, for school district defendants-appellees.

Before: Alfred T. GOODWIN, Stephen REINHARDT and FERNANDEZ, Circuit Judges

Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

## OPINION

GOODWIN, Circuit Judge:

Michael Newdow appeals a judgment dismissing his challenge to the constitutionality of the words "under God" in the Pledge of Allegiance to the Flag. Newdow argues that the addition of these words by a 1954 federal statute to the previous version of the Pledge of Allegiance (which made no reference to God) and the daily recitation in the classroom of the Pledge of Allegiance, with the added words included, by his daughter's public school teacher are violations of the Establishment Clause of the First Amendment to the United States Constitution.

## FACTUAL AND PROCEDURAL BACKGROUND

Newdow is an atheist whose daughter attends public elementary school in the Elk Grove Unified School District ("EGUSD") in California. In accordance with state law and a school district rule, EGUSD teachers begin each school day by leading their students in a recitation of the Pledge of Allegiance ("the Pledge"). The California Education Code requires that public schools begin each school day with "appropriate patriotic exercises" and that "[t]he giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy" this requirement. Cal. Educ. Code § 52720 (1989) (hereinafter "California statute").[1] To implement the California statute, the school district that Newdow's daughter attends has promulgated a policy that states, in pertinent part: "Each elementary school class [shall] recite the pledge of allegiance to the flag once each day."[2]

The classmates of Newdow's daughter in the EGUSD are led by their teacher in reciting the Pledge codified in federal law. On June 22, 1942, Congress first codified the Pledge as "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all." Pub.L. No. 623, Ch. 435, § 7, 56 Stat. 380 (1942) (codified at 36 U.S.C. § 1972). On June 14, 1954, Congress amended Section 1972 to add the words "under God" after the word "Nation." Pub.L. No. 396, Ch. 297, 68 Stat. 249 (1954) ("1954 Act"). The Pledge is currently codified as "I pledge allegiance to the Flag of the United

1. The relevant portion of California Education Code § 52720 reads:
 In every public elementary school each day during the school year at the beginning of the first regularly scheduled class or activity period at which the majority of the pupils of the school normally begin the schoolday, there shall be conducted appropriate patriotic exercises. The giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy the requirements of this section.

2. The SCUSD, the school district that Newdow claims his daughter may in the future attend, has promulgated a similar rule: "Each school shall conduct patriotic exercises daily. . . . The Pledge of Allegiance to the flag will fulfill this requirement." However, as discussed *infra*, Newdow lacks standing to challenge the SCUSD's rule requiring recitation of the Pledge.

States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all." 4 U.S.C. § 4 (1998) (Title 36 was revised and recodified by Pub.L. No. 105–225, § 2(a), 112 Stat. 1494 (1998). Section 172 was abolished, and the Pledge is now found in Title 4.)

Newdow does not allege that his daughter's teacher or school district requires his daughter to participate in reciting the Pledge.[3] Rather, he claims that his daughter is injured when she is compelled to "watch and listen as her state-employed teacher in her state-run school leads her classmates in a ritual proclaiming that there is a God, and that our's [sic] is 'one nation under God.' "

Newdow's complaint in the district court challenged the constitutionality, under the First Amendment, of the 1954 Act, the California statute, and the school district's policy requiring teachers to lead willing students in recitation of the Pledge. He sought declaratory and injunctive relief, but did not seek damages.

The school districts and their superintendents (collectively, "school district defendants") filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. Magistrate Judge Peter A. Nowinski held a hearing at which the school district defendants requested that the court rule only on the constitutionality of the Pledge, and defer any ruling on sovereign immunity. The United States Congress, the United States, and the President of the United States (collectively, "the federal defendants") joined in the motion to dismiss filed by the school district defendants. The magistrate judge reported findings and a recommendation; District Judge Edward J. Schwartz approved the recommendation and entered a judgment of dismissal. This appeal followed.

## DISCUSSION

### A. Jurisdiction

 Newdow asks the district court to order the President of the United States ("the President") to "alter, modify or repeal" the Pledge by removing the words "under God"; and to order the United States Congress ("Congress") "immediately to act to remove the words 'under God' from the Pledge." The President, however, is not an appropriate defendant in an action challenging the constitutionality of a federal statute. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (plurality) (observing that a court of the United States " 'has no jurisdiction of a bill to enjoin the President in the performance of his official duties' ") (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501, 18 L.Ed. 437 (1866)).

 Similarly, in light of the Speech and Debate Clause of the Constitution, Art. I, § 6, cl. 1, the federal courts lack jurisdiction to issue orders directing Congress to enact or amend legislation. *See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). Because the words that amended the Pledge were enacted into law by statute, the district court may

---

**3.** Compelling students to recite the Pledge was held to be a First Amendment violation in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("[T]he action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."). *Barnette* was decided before the 1954 Act added the words "under God" to the Pledge.

not direct Congress to delete those words any more than it may order the President to take such action. All this, of course, is aside from the fact that the President has no authority to amend a statute or declare a law unconstitutional, those functions being reserved to Congress and the federal judiciary respectively.

■ Newdow nevertheless argues that because the 1954 Act violates the Establishment Clause, Congress should not be protected by the Speech and Debate Clause. This argument misses the jurisdictional, or separation of powers, point. As the Court held in *Eastland,* in determining whether or not the acts of members of Congress are protected by the Speech and Debate Clause, the court looks solely to whether or not the acts fall within the legitimate legislative sphere; if they do, Congress is protected by the absolute prohibition of the Clause against being "questioned in any other Place." *Id.* at 501. "If the mere allegation that a valid legislative act·was undertaken for an unworthy purpose would lift the protection of the Clause, then the Clause simply would not provide the protection historically undergirding it." *Id.* at 508–09, 95 S.Ct. 1813. Although the district court lacks jurisdiction over the President and the Congress, the question of the constitutionality of the 1954 Act remains before us. While the court correctly dismissed the claim against those parties, it survives against others.

### B. The State of California as a defendant

The State of California did not join in the motion to dismiss or otherwise participate in the district court proceedings. It did, however, *sub silentio,* receive the benefit of the district court's ruling dismissing the complaint. Accordingly, a reversal of the order would result in the reinstatement of the complaint against the state. With respect to the validity of the California statute, however, unlike in the case of the Congressional enactment and the school district policy, no arguments, legal or otherwise, were advanced by the parties either below or here. Thus, we do not address separately the validity of the California statute.

### C. Standing

■ Article III standing is a jurisdictional issue. *See United States v. Viltrakis,* 108 F.3d 1159, 1160 (9th Cir.1997). Accordingly, it "may be raised at any stage of the proceedings, including for the first time on appeal." *See A–Z Intern. v. Phillips,* 179 F.3d 1187, 1190–91 (9th Cir.1999). To satisfy standing requirements, a plaintiff must prove that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

■ Newdow has standing as a parent to challenge a practice that interferes with his right to direct the religious education of his daughter. "Parents have a right to direct the religious upbringing of their children and, on that basis, have standing to protect their right." *Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 795 (9th Cir.1999) (en banc); *see also Grove v. Mead Sch. Dist. No. 354,* 753 F.2d 1528, 1532 (9th Cir.1985) ("Appellants have standing to challenge alleged violations of the establishment clause of the First

Amendment if they are directly affected by use of [the challenged book] in the English curriculum. [Appellant] has standing as a parent whose right to direct the religious training of her child is allegedly affected.") (citation omitted).

■ Newdow has standing to challenge the EGUSD's policy and practice regarding the recitation of the Pledge because his daughter is currently enrolled in elementary school in the EGUSD. However, Newdow has no standing to challenge the SCUSD's policy and practice because his daughter is not currently a student there. The SCUSD and its superintendent have not caused Newdow or his daughter an "injury in fact" that is "actual or imminent, not conjectural or hypothetical." *Laidlaw*, 528 U.S. at 180, 120 S.Ct. 693 (citing *Lujan*, 504 U.S. at 560–561, 112 S.Ct. 2130).

■ The final question of standing relates to the 1954 Act. Specifically, has Newdow suffered an "injury in fact" that is "fairly traceable" to the enactment of the 1954 Act? *Id.*

■ We begin our inquiry by noting the general rule that the standing requirements for an action brought under the Establishment Clause are the same as for any other action. *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 488–90, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). "The requirement of standing focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. Moreover, we know of no principled basis on which to create a hierarchy of constitutional values or a complementary 'sliding scale' of standing which might permit respondents to invoke the judicial power of the United States." *Id.* at 484, 102 S.Ct. 752 (citation and internal quotation marks omitted). In *Valley Forge*, an organization

dedicated to the separation of church and state brought suit challenging the federal government's grant of surplus federal property to a church-related college. The suit alleged that this grant of real property, without any financial payment by the college, was a violation of the Establishment Clause. The Supreme Court found that the plaintiff had standing neither as a taxpayer, *see id.* at 479–80, 102 S.Ct. 752, nor as a party personally injured as a consequence of the alleged unconstitutional action, *see id.* at 484–86, 102 S.Ct. 752. The "psychological consequence presumably produced by observation of conduct with which one disagrees .... is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Id.* at 485–86, 102 S.Ct. 752. The Court emphasized that "'[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.'" *Id.* at 489, 102 S.Ct. 752 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).

While *Valley Forge* remains good law, the Supreme Court in more recent opinions has indirectly broadened the notion of Establishment Clause standing in public education cases by holding that the mere enactment of a statute may constitute an Establishment Clause violation. In *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), the Court considered an Establishment Clause challenge to an Alabama statute that originally had authorized a one-minute period of silence in public schools "for meditation," but was later amended to authorize a period of silence "for meditation or voluntary prayer." *Id.* at 40–42, 105 S.Ct. 2479. Although the previous form of the statute specifically allowed students to use the moment of silence for "meditation," silent prayer was always an option. "[I]t is un-

disputed that at the time of the enactment of [the amended statute] there was no governmental practice impeding students from silently praying for one minute at the beginning of each schoolday." *Id.* at 57 n. 45, 105 S.Ct. 2479. Nor were students, under the amended form of the statute, compelled to use the allotted time for prayer. In sum, the amendment to the Alabama statute had no discernible effect on public school students other than to inform them that the state was encouraging them to engage in prayer during their daily moment of silence. Because the Supreme Court has repeatedly held that standing is a jurisdictional requirement, the existence of which each federal court must determine for itself, *see Lujan*, 504 U.S. at 559–561, 112 S.Ct. 2130; *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), we may presume that in *Wallace* the Court examined the standing question before deciding the merits, and that the Court determined that the schoolchildren's parents had standing to challenge the amended Alabama statute.

Our reading of *Wallace* is supported by *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), where the Court upheld a facial challenge to a school district's policy of permitting, but not requiring, prayer initiated and led by a student at high school football games. Noting that "the Constitution also requires that we keep in mind 'the myriad, subtle ways in which the Establishment Clause values can be eroded,'" *id.* at 314, 120 S.Ct. 2266(quoting *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604, 694 (1984) (O'Connor, J., concurring)), the Court held that the "mere passage by the District of a policy that has the purpose and perception of government establishment of religion," *id.*, violated the Establishment Clause. "[T]he *simple enactment*

of this policy, with the purpose and perception of school endorsement of student prayer, was a constitutional violation." *Id.* at 316, 120 S.Ct. 2266 (emphasis added).

In *Wallace* and *Santa Fe*, the Court looked at the language of each statute, the context in which the statute was enacted, and its legislative history to determine that the challenged statute caused an injury in violation of the Establishment Clause. "We refuse to turn a blind eye to the context in which this policy arose, and that context quells any doubt that this policy was implemented with the purpose of endorsing school prayer." *Id.* at 315, 120 S.Ct. 2266. Justice O'Connor's concurrence in *Wallace* noted that whether a statute actually conveys a message of endorsement of religion is "not entirely a question of fact .... The relevant issue is whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as state endorsement of prayer in public schools." 472 U.S. at 76, 105 S.Ct. 2479(O'Connor, J., concurring in judgment). In *Santa Fe*, "[t]he text and history of this policy ... reinforce our objective student's perception that the prayer is, in actuality, encouraged by the school." 530 U.S. at 308, 120 S.Ct. 2266. In evaluating the purpose of the school district policy, the Court found "most striking ... the evolution of the current policy." *Id.* at 309, 120 S.Ct. 2266. In *Wallace*, a review of the legislative history led the Court to conclude that enactment of the amended statute "was not motivated by any clearly secular purpose—indeed, the statute had *no* secular purpose." 472 U.S. at 56, 105 S.Ct. 2479; *see also id.* at 57–60, 105 S.Ct. 2479.

Operating within the above-described legal landscape, we now turn to the question initially posed, namely, does Newdow have standing to challenge the 1954 Act? Initially, we note that the 1954 statute chal-

lenged by Newdow is similar to the Alabama statute struck down in *Wallace*. Neither statute works the traditional type of "injury in fact" that is implicated when a statute compels or prohibits certain activity, nor do the amendments brought about by these statutes lend themselves to "as-applied" constitutional review. Nevertheless, the Court in *Wallace*, at least implicitly, determined that the schoolchildren's parents had standing to attack the challenged statute. Moreover, the legislative history of the 1954 Act shows that the "under God" language was not meant to sit passively in the federal code unbeknownst to the public; rather, the sponsors of the amendment knew about and capitalized on the state laws and school district rules that mandate recitation of the Pledge. The legislation's House sponsor, Representative Louis C. Rabaut, testified at the Congressional hearing that "the children of our land, in the daily recitation of the pledge in school, will be daily impressed with a true understanding of our way of life and its origins," and this statement was incorporated into the report of the House Judiciary Committee. H.R.Rep. No. 83–1693, at 3 (1954), *reprinted in* 1954 U.S.C.C.A.N. 2339, 2341. Taken within its context, the 1954 addendum was designed to result in the recitation of the words "under God" in school classrooms throughout the land on a daily basis, and therefore constituted as much of an injury-in-fact as the policies considered in *Wallace* and *Santa Fe*. As discussed earlier, Newdow has standing as a parent to challenge a practice that interferes with his right to direct the religious education of his daughter. The mere enactment of the 1954 Act in its particular context constitutes a religious recitation policy that interferes with Newdow's right to direct the religious education of his daughter. Accordingly, we hold that Newdow has standing to challenge the 1954 Act.

## D. Establishment Clause

■ The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion," U.S. Const. amend. I, a provision that "the Fourteenth Amendment makes applicable with full force to the States and their school districts." *Lee v. Weisman*, 505 U.S. 577, 580, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Over the last three decades, the Supreme Court has used three interrelated tests to analyze alleged violations of the Establishment Clause in the realm of public education: the three-prong test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); the "endorsement" test, first articulated by Justice O'Connor in her concurring opinion in *Lynch*, and later adopted by a majority of the Court in *County of Allegheny v. ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); and the "coercion" test first used by the Court in *Lee*.

■ In 1971, in the context of unconstitutional state aid to nonpublic schools, the Supreme Court in *Lemon* set forth the following test for evaluating alleged Establishment Clause violations. To survive the "*Lemon* test," the government conduct in question (1) must have a secular purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105. The Supreme Court applied the *Lemon* test to every Establishment case it decided between 1971 and 1984, with the exception of *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the

case upholding legislative prayer.[4]*See Wallace,* 472 U.S. at 63, 105 S.Ct. 2479 (Powell, J., concurring).

In the 1984 *Lynch* case, which upheld the inclusion of a nativity scene in a city's Christmas display, Justice O'Connor wrote a concurring opinion in order to suggest a "clarification" of Establishment Clause jurisprudence. 465 U.S. at 687, 104 S.Ct. 1355 (O'Connor, J., concurring). Justice O'Connor's "endorsement" test effectively collapsed the first two prongs of the *Lemon* test:

> The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community. Government can run afoul of that prohibition in two principal ways. One is excessive entanglement with religious institutions.... The second and more direct infringement is government endorsement or disapproval of religion. Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.

*Id.* at 687–88, 91 S.Ct. 2105 (O'Connor, J., concurring).

The Court formulated the "coercion test" when it held unconstitutional the practice of including invocations and benedictions in the form of "nonsectarian" prayers at public school graduation ceremonies. *Lee,* 505 U.S. at 599, 112 S.Ct. 2649. Declining to reconsider the validity of the *Lemon* test, the Court in *Lee* found it unnecessary to apply the *Lemon* test to find the challenged practices unconstitutional. *Id.* at 587, 112 S.Ct. 2649. Rather, it relied on the principle that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise to act in a way which establishes a state religion or religious faith, or tends to do so." *Id.* (citations and internal quotation marks omitted).[5] The Court first examined the degree of school involvement in the prayer, and found that "the graduation prayers bore the imprint of the State and thus put school-age children who objected in an untenable position." *Id.* at 590. The next issue the Court considered was "the position of the students, both those who desired the prayer and she who did not." *Id.* Noting that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," *id.* at 592, 112

4. In *Marsh,* the Court "held that the Nebraska Legislature's practice of opening each day's session with a prayer by a chaplain paid by the State did not violate the Establishment Clause of the First Amendment. [The] holding was based upon the historical acceptance of the practice that had become 'part of the fabric of our society.'" *Wallace,* 472 U.S. at 63 n. 4, 105 S.Ct. 2479 (Powell, J., concurring) (quoting *Marsh,* 463 U.S. at 792, 103 S.Ct. 3330).

5. Although this formulation is referred to as the "coercion" test, it should be noted that coercion is not a *necessary* element in finding an Establishment Clause violation. "The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion...." *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). "[T]his court has never relied on coercion alone as the touchstone of Establishment Clause analysis. To require a showing of coercion, even indirect coercion, as an essential element of an Establishment Clause violation would make the free Exercise Clause a redundancy." *Allegheny,* 492 U.S. at 628, 109 S.Ct. 3086 (O'Connor, J., concurring). "Over the years, this Court has declared the invalidity of many noncoercive state laws and practices conveying a message of religious endorsement." *Lee,* 505 U.S. at 618, 112 S.Ct. 2649 (Souter, J., concurring).

S.Ct. 2649, the Court held that the school district's supervision and control of the graduation ceremony put impermissible pressure on students to participate in, or at least show respect during, the prayer, *id.* at 593, 112 S.Ct. 2649. The Court concluded that primary and secondary school children may not be placed in the dilemma of either participating in a religious ceremony or protesting. *Id.* at 594, 112 S.Ct. 2649.

Finally, in its most recent school prayer case, the Supreme Court applied the *Lemon* test, the endorsement test, and the coercion test to strike down a school district's policy of permitting student-led "invocations" before high school football games. *See Santa Fe*, 530 U.S. at 310–16, 120 S.Ct. 2266. Citing *Lee*, the Court held that "the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." *Id.* at 312, 120 S.Ct. 2266. Applying the *Lemon* test, the Court found that the school district policy was facially unconstitutional because it did not have a secular purpose. *Id.* at 314–16. The Court also used language associated with the endorsement test. *Id.* at 315, 120 S.Ct. 2266("[T]his policy was implemented with the purpose of endorsing school prayer."); *id.* at 317, 120 S.Ct. 2266 ("Government efforts to endorse religion cannot evade constitutional reproach based solely on the remote possibility that those attempts may fail.").

We are free to apply any or all of the three tests, and to invalidate any measure that fails any one of them. The Supreme Court has not repudiated *Lemon;* in *Santa Fe*, it found that the application of each of the three tests provided an independent ground for invalidating the statute at issue in that case; and in *Lee*, the Court invalidated the policy solely on the basis of the coercion test. Although this court has typ-ically applied the *Lemon* test to alleged Establishment Clause violations, *see, e.g., Am. Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1120–21(9th Cir. 2002), we are not required to apply it if a practice fails one of the other tests. Nevertheless, for purposes of completeness, we will analyze the school district policy and the 1954 Act under all three tests.

 We first consider whether the 1954 Act and the EGUSD's policy of teacher-led Pledge recitation survive the endorsement test. The magistrate judge found that "the ceremonial reference to God in the pledge does not convey endorsement of particular religious beliefs." Supreme Court precedent does not support that conclusion.

In the context of the Pledge, the statement that the United States is a nation "under God" is an endorsement of religion. It is a profession of a religious belief, namely, a belief in monotheism. The recitation that ours is a nation "under God" is not a mere acknowledgment that many Americans believe in a deity. Nor is it merely descriptive of the undeniable historical significance of religion in the founding of the Republic. Rather, the phrase "one nation under God" in the context of the Pledge is normative. To recite the Pledge is not to describe the United States; instead, it is to swear allegiance to the values for which the flag stands: unity, indivisibility, liberty, justice, and—since 1954—monotheism. The text of the official Pledge, codified in federal law, impermissibly takes a position with respect to the purely religious question of the existence and identity of God. A profession that we are a nation "under God" is identical, for Establishment Clause purposes, to a profession that we are a nation "under Jesus," a nation "under Vishnu," a nation "under Zeus," or a nation "under no god,"

because none of these professions can be neutral with respect to religion. "[T]he government must pursue a course of complete neutrality toward religion." *Wallace*, 472 U.S. at 60, 105 S.Ct. 2479. Furthermore, the school district's practice of teacher-led recitation of the Pledge aims to inculcate in students a respect for the ideals set forth in the Pledge, and thus amounts to state endorsement of these ideals. Although students cannot be forced to participate in recitation of the Pledge, the school district is nonetheless conveying a message of state endorsement of a religious belief when it requires public school teachers to recite, and lead the recitation of, the current form of the Pledge.

The Supreme Court recognized the normative and ideological nature of the Pledge in *Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. There, the Court held unconstitutional a school district's wartime policy of punishing students who refused to recite the Pledge and salute the flag. *Id.* at 642, 63 S.Ct. 1178. The Court noted that the school district was compelling the students "to declare a belief," *id.* at 631, 63 S.Ct. 1178, and "requir[ing] the individual to communicate by word and sign his acceptance of the political ideas [the flag] ... bespeaks," *id.* at 633, 63 S.Ct. 1178. "[T]he compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind." *Id.* The Court emphasized that the political concepts articulated in the Pledge[6] were idealistic, not descriptive: " '[L]iberty and justice for all,' if it must be accepted as descriptive of the present order rather than an ideal, might to some seem an overstatement." *Id.* at 634 n. 14, 63 S.Ct. 1178. The Court concluded that: "If there is any fixed star in

our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642, 63 S.Ct. 1178.

The Pledge, as currently codified, is an impermissible government endorsement of religion because it sends a message to unbelievers "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch*, 465 U.S. at 688, 104 S.Ct. 1355(O'Connor, J., concurring). Justice Kennedy, in his dissent in *Allegheny*, agreed:

> [B]y statute, the Pledge of Allegiance to the Flag describes the United States as 'one nation under God.' To be sure, no one is obligated to recite this phrase, ... but it borders on sophistry to suggest that the reasonable atheist would not feel less than a full member of the political community every time his fellow Americans recited, as part of their expression of patriotism and love for country, a phrase he believed to be false.

*Allegheny*, 492 U.S. at 672, 109 S.Ct. 3086 (Kennedy, J., dissenting) (citations and internal quotation marks omitted).[7] Consequently, the policy and the Act fail the endorsement test.

Similarly, the policy and the Act fail the coercion test. Just as in *Lee*, the policy and the Act place students in the untenable position of choosing between participating in an exercise with religious content or protesting. As the Court observed with respect to the graduation prayer in that case: "What to most believers may seem

---

6. *Barnette* was decided before "under God" was added, and thus the Court's discussion was limited to the political ideals contained in the Pledge.

7. For Justice Kennedy, this result was a reason to reject the endorsement test.

nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Lee,* 505 U.S. at 592, 112 S.Ct. 2649. Although the defendants argue that the religious content of "one nation under God" is minimal, to an atheist or a believer in certain non-Judeo-Christian religions or philosophies, it may reasonably appear to be an attempt to enforce a "religious orthodoxy" of monotheism, and is therefore impermissible. The coercive effect of this policy is particularly pronounced in the school setting given the age and impressionability of schoolchildren, and their understanding that they are required to adhere to the norms set by their school, their teacher and their fellow students.[8] Furthermore, under *Lee,* the fact that students are not required to participate is no basis for distinguishing *Barnette* from the case at bar because, even without a recitation requirement for each child, the mere fact that a pupil is required to listen every day to the statement "one nation under God" has a coercive effect.[9] The coercive

effect of the Act is apparent from its context and legislative history, which indicate that the Act was designed to result in the daily recitation of the words "under God" in school classrooms. President Eisenhower, during the Act's signing ceremony, stated: "From this day forward, the millions of our school children will daily proclaim in every city and town, every village and rural schoolhouse, the dedication of our Nation and our people to the Almighty." 100 Cong. Rec. 8618 (1954) (statement of Sen. Ferguson incorporating signing statement of President Eisenhower). Therefore, the policy and the Act fail the coercion test.[10]

Finally we turn to the *Lemon* test, the first prong of which asks if the challenged policy has a secular purpose. Historically, the primary purpose of the 1954 Act was to advance religion, in conflict with the first prong of the *Lemon* test. The federal defendants "do not dispute that the words 'under God' were intended" "to recognize a Supreme Being," at a time when the government was publicly inveighing against atheistic communism. Nonetheless, the federal defendants argue that the Pledge

---

**8.** The "subtle and indirect" social pressure which permeates the classroom also renders more acute the message sent to non-believing schoolchildren that they are outsiders. *See Lee,* 505 U.S. at 592–93, 112 S.Ct. 2649 (stating that "the risk of indirect coercion" from prayer exercises is particularly "pronounced" in elementary and secondary public school because students are subjected to peer pressure and public pressure which is "as real as any overt compulsion").

**9.** The objection to the Pledge in *Barnette,* like in the case at bar, was based upon a religious ground. The Pledge in the classroom context imposes upon schoolchildren the constitutionally unacceptable choice between participating and protesting. Recognizing the severity of the effect of this form of coercion on children, the Supreme Court in *Lee* stated, "the State may not, consistent with the Establish-

ment Clause, place primary and secondary school children in this position." 505 U.S. at 593, 112 S.Ct. 2649.

**10.** In *Aronow v. United States,* 432 F.2d 242 (9th Cir.1970), this court, without reaching the question of standing, upheld the inscription of the phrase "In God We Trust" on our coins and currency. *But cf. Wooley v. Maynard,* 430 U.S. 705, 722, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (Rehnquist, J., dissenting) (stating that the majority's holding leads logically to the conclusion that "In God We Trust" is an unconstitutional affirmation of belief). In any event, *Aronow* is distinguishable in many ways from the present case. The most important distinction is that school children are not coerced into reciting or otherwise actively led to participating in an endorsement of the markings on the money in circulation.

must be considered as a whole when assessing whether it has a secular purpose. They claim that the Pledge has the secular purpose of "solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch*, 465 U.S. at 693, 104 S.Ct. 1355.

The flaw in defendants' argument is that it looks at the text of the Pledge "as a whole," and glosses over the 1954 Act. The problem with this approach is apparent when one considers the Court's analysis in *Wallace*. There, the Court struck down Alabama's statute mandating a moment of silence for "meditation or voluntary prayer" not because the final version "as a whole" lacked a primary secular purpose, but because the state legislature had amended the statute specifically and solely to add the words "or voluntary prayer." 472 U.S. at 59–60, 105 S.Ct. 2479.

By analogy to *Wallace*, we apply the purpose prong of the *Lemon* test to the amendment that added the words "under God" to the Pledge, not to the Pledge in its final version. As was the case with the amendment to the Alabama statute in *Wallace*, the legislative history of the 1954 Act reveals that the Act's *sole* purpose was to advance religion, in order to differentiate the United States from nations under communist rule. "[T]he First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion." *Id.* at 56, 105 S.Ct. 2479 (citations omitted) (applying the *Lemon* test). As the legislative history of the 1954 Act sets forth:

> At this moment of our history the principles underlying our American Government and the American way of life are under attack by a system whose philosophy is at direct odds with our own. Our American Government is founded on the concept of the individuality and the dig-

nity of the human being. Underlying this concept is the belief that the human person is important because he was created by God and endowed by Him with certain inalienable rights which no civil authority may usurp. The inclusion of God in our pledge therefore would further acknowledge the dependence of our people and our Government upon the moral directions of the Creator. At the same time it would serve to deny the atheistic and materialistic concepts of communism with its attendant subservience of the individual.

H.R.Rep. No. 83–1693, at 1–2 (1954), *reprinted in* 1954 U.S.C.C.A.N. 2339, 2340. This language reveals that the purpose of the 1954 Act was to take a position on the question of theism, namely, to support the existence and moral authority of God, while "deny[ing] . . . atheistic and materialistic concepts." *Id.* Such a purpose runs counter to the Establishment Clause, which prohibits the government's endorsement or advancement not only of one particular religion at the expense of other religions, but also of religion at the expense of atheism.

> [T]he Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of a free and voluntary choice by the faithful, and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects— or even intolerance among "religions"—to encompass into-

lerance of the disbeliever and the uncertain.

*Wallace*, 472 U.S. at 52–54, 105 S.Ct. 2479.

■■■ In language that attempts to prevent future constitutional challenges, the sponsors of the 1954 Act expressly disclaimed a religious purpose. "This is not an act establishing a religion.... A distinction must be made between the existence of a religion as an institution and a belief in the sovereignty of God. The phrase 'under God' recognizes only the guidance of God in our national affairs." H.R.Rep. No. 83– 1693, at 3 (1954), *reprinted in* 1954 U.S.C.C.A.N. 2339, 2341–42. This alleged distinction is irrelevant for constitutional purposes. The Act's affirmation of "a belief in the sovereignty of God" and its recognition of "the guidance of God" are endorsements by the government of religious beliefs. The Establishment Clause is not limited to "religion as an institution"; this is clear from cases such as *Santa Fe*, where the Court struck down student-initiated and student-led prayer at high school football games. 530 U.S. at 310–16, 120 S.Ct. 2266. The Establishment Clause guards not only against the establishment of "religion as an institution," but also against the endorsement of religious ideology by the government. Because the Act fails the purpose prong of *Lemon*, we need not ex-

amine the other prongs. *Lemon*, 403 U.S. at 612–14, 91 S.Ct. 2105.

Similarly, the school district policy also fails the *Lemon* test. Although it survives the first prong of *Lemon* because, as even Newdow concedes, the school district had the secular purpose of fostering patriotism in enacting the policy, the policy fails the second prong. As explained by this court in *Kreisner v. City of San Diego*, 1 F.3d 775, 782(9th Cir. 1993), and by the Supreme Court in *School District of Grand Rapids v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267(1985), the second *Lemon* prong asks "whether the challenged government action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices."[11] *Ball*, 473 U.S. at 390, 105 S.Ct. 3216. Given the age and impressionability of schoolchildren, as discussed above, particularly within the confined environment of the classroom, the policy is highly likely to convey an impermissible message of endorsement to some and disapproval to others of their beliefs regarding the existence of a monotheistic God. Therefore the policy fails the effects prong of *Lemon*, and fails the *Lemon* test. In sum, both the policy and the Act fail the *Lemon* test as well as the endorsement and coercion tests.[12]

---

**11.** Although *Ball* was overruled in part by *Agostini v. Felton*, 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), as the Court stated in *Agostini*, *Ball*'s statement of the general principles and relevant tests to be used in determining what constitutes an Establishment Clause violation remain intact; only the underlying factual assumptions and presumptions have changed. In particular, the Court rejected the following three core assumptions of *Ball*:
(i) any public employee who works on the premises of a religious school is presumed to inculcate religion in her work; (ii) the presence of public employees on private school

premises creates a symbolic union between church and state; and (iii) any and all public aid that directly aids the educational function of religious schools impermissibly finances religious indoctrination, even if the aid reaches such schools as a consequence of private decisionmaking.
*Agostini*, 521 U.S. at 222, 117 S.Ct. 1997. Therefore, *Ball*'s restatement of the second prong of *Lemon* remains valid even after *Agostini*.

**12.** We recognize that the Supreme Court has occasionally commented in dicta that the presence of "one nation under God" in the

In conclusion, we hold that (1) the 1954 Act adding the words "under God" to the Pledge, and (2) EGUSD's policy and practice of teacher-led recitation of the Pledge, with the added words included, violate the Establishment Clause. The judgment of dismissal is vacated with respect to these two claims, and the cause is remanded for further proceedings consistent with our holding. Plaintiff is to recover costs on this appeal.

REVERSED AND REMANDED.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I concur in parts A, B and C[1] of the majority opinion, but dissent as to part D.

---

Pledge of Allegiance is constitutional. *See Allegheny*, 492 U.S. at 602–03, 109 S.Ct. 3086; *Lynch*, 465 U.S. at 676, 104 S.Ct. 1355; *id.* at 693, 104 S.Ct. 1355 (O'Connor, J., concurring); *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 303–04, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); *id.* at 306–08, 83 S.Ct. 1560(Goldberg, J., joined by Harlan, J., concurring); *Engel*, 370 U.S. at 435 n. 21, 82 S.Ct. 1261. However, the Court has never been presented with the question directly, and has always clearly refrained from deciding it. Accordingly, it has never applied any of the three tests to the Act or to any school policy regarding the recitation of the Pledge. That task falls to us, although the final word, as always, remains with the Supreme Court.

The only other United States Court of Appeals to consider the issue is the Seventh Circuit, which held in *Sherman v. Community Consolidated School District 21*, 980 F.2d 437 (7th Cir.1992), that a policy similar to the one before us regarding the recitation of the Pledge of Allegiance containing the words "one nation under God" was constitutional. The *Sherman* court first stated that:

If as *Barnette* holds no state may require anyone to recite the Pledge, and if as the prayer cases hold the recitation by a teacher or rabbi of unwelcome words is coercion, then the Pledge of Allegiance becomes unconstitutional under all circumstances, just as no school may read from a holy scripture at the start of class.

980 F.2d at 444. It then concludes, however, that this reasoning is flawed because the First Amendment "[does] not establish general rules about speech or schools; [it] call[s] for religion to be treated differently." *Id.* We have some difficulty understanding this statement; we do not believe that the Constitution prohibits compulsory patriotism as in *Barnette*, but permits compulsory religion as in this case. If government-endorsed religion is to be treated differently from government-endorsed patriotism, the treatment must be less favorable, not more.

The Seventh Circuit makes an even more serious error, however. It not only refuses to apply the *Lemon* test because of the Supreme Court's criticism of that test in *Lee*, but it also fails to apply the coercion test from *Lee* or the endorsement test from *Lynch*. Circuit courts are not free to ignore Supreme Court precedent in this manner. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Instead of applying any of the tests announced by the Supreme Court, the Seventh Circuit simply frames the question as follows: "Must ceremonial references in civic life to a deity be understood as prayer, or support for all monotheistic religions, to the exclusion of atheists and those who worship multiple gods?" 980 F.2d at 445. Relying in part on Supreme Court dicta regarding the Pledge, the court answers this question in the negative, determining that "under God" is a statement which, taken within its context in the Pledge, is devoid of any significant religious content, and therefore constitutional. *Id.* at 447–48. At the very least, as discussed above in the text, the Supreme Court requires that any policy alleged to be an Establishment Clause violation must be held to the scrutiny of the established tests. Our application of *all* of the tests compels the conclusion that the policy and the Act challenged here violate the Establishment Clause of the Constitution. Thus, we must respectfully differ from the Seventh Circuit.

1. I admit, however, to serious misgivings about standing to attack 4 U.S.C. § 4 itself. Congress has not compelled anyone to .do

We are asked to hold that inclusion of the phrase "under God" in this nation's Pledge of Allegiance violates the religion clauses of the Constitution of the United States. We should do no such thing. We should, instead, recognize that those clauses were not designed to drive religious expression out of public thought; they were written to avoid discrimination.

We can run through the litany of tests and concepts which have floated to the surface from time to time. Were we to do so, the one that appeals most to me, the one I think to be correct, is the concept that what the religion clauses of the First Amendment require is neutrality; that those clauses are, in effect, an early kind of equal protection provision and assure that government will neither discriminate for nor discriminate against a religion or religions. See Gentala v. City of Tucson, 244 F.3d 1065, 1083–86 (9th Cir.) (en banc) (Fernandez, J., dissenting), cert. granted and judgment vacated by —— U.S. ——, 122 S.Ct. 340, 151 L.Ed.2d 256 (2001); Goehring v. Brophy, 94 F.3d 1294, 1306–07 (9th Cir.1996) (Fernandez, J., concurring). But, legal world abstractions and ruminations aside, when all is said and done, the danger that "under God" in our Pledge of Allegiance will tend to bring about a theocracy or suppress somebody's beliefs is so minuscule as to be de minimis. The dan-

ger that phrase presents to our First Amendment freedoms is picayune at most.

Judges, including Supreme Court Justices, have recognized the lack of danger in that and similar expressions for decades, if not for centuries, as have presidents[2] and members of our Congress. See, e.g., County of Allegheny v. ACLU, 492 U.S. 573, 602–03, 672–73, 109 S.Ct. 3086, 3106, 3143, 106 L.Ed.2d 472 (1989); Wallace v. Jaffree, 472 U.S. 38, 78 n. 5, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); Lynch v. Donnelly, 465 U.S. 668, 676, 693, 716, 104 S.Ct. 1355, 1361, 79 L.Ed.2d 604 (1984); Abington Sch. Dist. v. Schempp, 374 U.S. 203, 306–08, 83 S.Ct. 1560, 1615–16, 10 L.Ed.2d 844 (1963);[3] Separation of Church & State Comm. v. City of Eugene, 93 F.3d 617, 622 (9th Cir.1996) (O'Scannlain, J., concurring); Gaylor v. United States, 74 F.3d 214, 217–18 (10th Cir.1996); Sherman v. Cmty Consol. Sch. Dist. 21, 980 F.2d 437, 445–48 (7th Cir.1992); O'Hair v. Murray, 588 F.2d 1144, 1144 (5th Cir.1979) (per curiam); Aronow v. United States, 432 F.2d 242, 243–44(9th Cir. 1970); cf. Marsh v. Chambers, 463 U.S. 783, 795, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (legislative prayer). I think it is worth stating a little more about two of the cases which I have just cited. In County of Allegheny, 492 U.S. at 602–03, 109 S.Ct. at 3106, the Supreme Court had this to say: "Our previous opinions

---

anything. It surely has not directed that the Pledge be recited in class; only the California authorities have done that. Even if a general lack of standing to directly attack 4 U.S.C. § 4 would deprive federal courts of the opportunity to strike "under God" from that statute, any lament would be no more than a complaint about the limits on federal judges' constitutional power. Nonetheless, that ultimately makes little difference to the resolution of the First Amendment issue in this case.

**2.** See, e.g., Lee v. Weisman, 505 U.S. 577, 632–35, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting).

**3.** The citations to the four preceding Supreme Court opinions are to majority opinions, concurring opinions, and dissents. Because my point is that a number of Justices have recognized the lack of danger and because I hope to avoid untoward complication in the setting out of the citations, I have not designated which Justices have joined in which opinion. All in all, however, perusing those opinions indicates that Chief Justice Burger, Chief Justice Rehnquist, and Justices Harlan, Brennan, White, Goldberg, Marshall, Blackmun, Powell, Stevens, O'Connor, Scalia, and Kennedy have so recognized.

have considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement of religious belief." The Seventh Circuit, reacting in part to that statement, has wisely expressed the following thought:

> Plaintiffs observe that the Court sometimes changes its tune when it confronts a subject directly. True enough, but an inferior court had best respect what the majority says rather than read between the lines. If the Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously. If the Justices are just pulling our leg, let them say so.

*Sherman,* 980 F.2d at 448.

Some, who rather choke on the notion of de minimis, have resorted to the euphemism "ceremonial deism." *See, e.g., Lynch,* 465 U.S. at 716, 104 S.Ct. at 1382(Brennan, J., dissenting). But whatever it is called (I care not), it comes to this: such phrases as "In God We Trust," or "under God" have no tendency to establish a religion in this country or to suppress anyone's exercise, or non-exercise, of religion, except in the fevered eye of persons who most fervently would like to drive all tincture of religion out of the public life of our polity. Those expressions have not caused any real harm of that sort over the years since 1791, and are not likely to do so in the future.[4] As I see it, that is not because they are drained

of meaning.[5] Rather, as I have already indicated, it is because their tendency to establish religion (or affect its exercise) is exiguous. I recognize that some people may not feel good about hearing the phrases recited in their presence, but, then, others might not feel good if they are omitted. At any rate, the Constitution is a practical and balanced charter for the just governance of a free people in a vast territory. Thus, although we do feel good when we contemplate the effects of its inspiring phrasing and majestic promises, it is not primarily a feel-good prescription.[6] In *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 630, 642, 63 S.Ct. 1178, 1181, 1187, 87 L.Ed. 1628 (1943), for example, the Supreme Court did not say that the Pledge could not be recited in the presence of Jehovah's Witness children; it merely said that they did not have to recite it.[7] That fully protected their constitutional rights by precluding the government from trenching upon "the sphere of intellect and spirit." *Id.* at 642, 63 S.Ct. at 1187. As the Court pointed out, their religiously based refusal "to participate in the ceremony [would] not interfere with or deny rights of others to do so." *Id.* at 630, 63 S.Ct. at 1181. We should not permit Newdow's feel-good concept to change that balance.

My reading of the stelliscript suggests that upon Newdow's theory of our Constitution, accepted by my colleagues today,

---

4. They have not led us down the long path to kulturkampf or worse. Those who are somehow beset by residual doubts and fears should find comfort in the reflection that no baleful religious effects have been generated by the existence of similar references to a deity throughout our history. More specifically, it is difficult to detect any signs of incipient theocracy springing up since the Pledge was amended in 1954.

5. *See also Sherman,* 980 F.2d at 448 (Manion, J., concurring).

6. We, by the way, indicated as much in *American Family Ass'n, Inc. v. City and County of San Francisco,* 277 F.3d 1114, 1125–26 (9th Cir. 2002), which involved governmental conduct that was much more questionable than adoption of the phrase "under God." *See id.* at 1126–28 (Noonan, J., dissenting).

7. I recognize that the Pledge did not then contain the phrase "under God."

we will soon find ourselves prohibited from using our album of patriotic songs in many public settings. "God Bless America" and "America the Beautiful" will be gone for sure, and while use of the first three stanzas of "The Star Spangled Banner" will still be permissible, we will be precluded from straying into the fourth.[8] And currency beware! Judges can accept those results if they limit themselves to elements and tests, while failing to look at the good sense and principles that animated those tests in the first place. But they do so at the price of removing a vestige of the awe we all must feel at the immenseness of the universe and our own small place within it, as well as the wonder we must feel at the good fortune of our country. That will cool the febrile nerves of a few at the cost of removing the healthy glow conferred upon many citizens when the forbidden verses, or phrases, are uttered, read, or seen.

In short, I cannot accept the eliding of the simple phrase "under God" from our Pledge of Allegiance, when it is obvious that its tendency to establish religion in this country or to interfere with the free exercise (or non-exercise) of religion is de minimis.[9]

Thus, I respectfully concur in part and dissent in part.

---

8. Nor will we be able to stray into the fourth stanza of "My Country 'Tis of Thee" for that matter.

9. Lest I be misunderstood, I must emphasize that to decide this case it is not necessary to say, and I do not say, that there is such a thing as a de minimis constitutional violation. What I do say is that the de minimis tendency of the Pledge to establish a religion or to interfere with its free exercise is no constitutional violation at all.